OPINION
{¶ 1} James M. Carter appeals from his conviction and sentence following a no-contest plea to several drug-related charges.
 {¶ 2} The record reflects that Dayton police encountered Carter in a gas-station *Page 2 
parking lot after observing him participate in what they believed was a drug transaction. He was removed from his vehicle, handcuffed, and searched. Police discovered drugs, cash, and digital scales in his possession. They also found drugs in his vehicle. Carter entered his no-contest pleas after pursuing an unsuccessful motion to suppress. The trial court imposed concurrent prison terms totaling one year. In an October 31, 2007, decision and entry, we reviewed an Anders brief submitted by Carter's former appellate counsel. We found arguable issues for appeal and appointed new counsel to assist him with the appeal.
 {¶ 3} Carter now advances two assignments of error. First, he contends the trial court erred in overruling his suppression motion because a pat-down performed at the scene exceeded the scope of a permissibleTerry frisk. Second, he claims the trial court erred in overruling his suppression motion where police lacked probable cause to arrest him.
 {¶ 4} In our prior Anders ruling, we reviewed a suppression hearing transcript and set forth the following pertinent facts:
 {¶ 5} "* * * Detective [David] House testified he worked in the Narcotics Unit for some nine (9) years. He testified that on November 28, 2005 at approximately 7:30 p.m., he and other Dayton detectives were conducting a surveillance operation at the Citgo gas station on Valley Street in Dayton. He testified they were conducting these activities since the parking lot of gas stations and convenience stores are frequently used to conduct drug transactions. (T. 5.)
 {¶ 6} "House testified that his narcotics unit conducted surveillance of the Citgo station parking lot for a couple of months before Carter's arrest and they made several *Page 3 
arrests for drug transactions when cars met in the parking lot for the drug transaction. (T. 6.) House testified that on the date in question, he observed a black Pontiac Firebird pull into the parking lot next to the gas station. House observed that the Firebird was occupied by a female driver, a male front-seat passenger, later identified as Danny Cody, and a rear passenger. The occupants remained in the vehicle for some twenty minutes until Cody finally entered the gas station. Very shortly thereafter, House observed a 1988 GMC Jimmy pull into the parking lot and travel through the lot and park along side the Pontiac Firebird. The [Jimmy] was being driven by the defendant. Immediately after the Jimmy parked next to the Firebird, House observed the rear passenger of the Firebird (Kenneth Kubus) get out of the vehicle and go over to the open driver's window of the Jimmy and he saw Carter hand Kubus something and Kubus hand something to Carter. (T. 11, 12.) House said the items appeared to be small objects. House testified he believed, in light of his experience, he had just witnessed a `drug deal' and he radioed the other officers to move into the parking lot. (T. 14.)
 {¶ 7} "House said he got out of his vehicle and identified himself as a police officer and he could see the defendant take his right hand and make a shoving motion down his right hip area. Fearing that Carter might be attempting to arm himself, House drew his revolver and pointed it at Carter and told him to show his hands. House said Carter complied with his order and House then ordered him to get out of the vehicle. House said Detective Rodney Barrett then recovered crack cocaine and heroin from Carter's pockets. House said he then conducted an inventory search of Carter's vehicle and he recovered a plastic bag between the console and the front driver's seat *Page 4 
containing four sandwich bags of marijuana.
 {¶ 8} "Detective Barrett testified he also had extensive experience with the narcotics unit, and he participated in the surveillance of the Citgo station on the date in question. Barrett testified he pulled Carter out of his vehicle, placed him on the ground right next to his vehicle and handcuffed him and then did a pat down. Barrett then testified he had Carter stand up and he started patting him down around his waist area. Barrett said he went into Carter's left pocket of his jeans and immediately felt, in light of his experience, what he believed to be crack cocaine. Barrett said he then went into Carter's pocket and removed the baggie of crack cocaine and as he did, a baggie of heroin fell out. Barrett said he then arrested him for possession of drugs. (T. 53, 54.) Barrett said he then recovered a digital scale from Carter's right front coat pocket and money from other pockets on his person. (T. 55.) Barrett said he saw a baggie of marijuana in the molding of the car's door handle."
 {¶ 9} In his first assignment of error, Carter does not dispute that Detectives House and Barrett possessed reasonable, articulable suspicion to believe he had engaged in a drug transaction. Therefore, Carter acknowledges that under Terry v. Ohio (1968), 392 U.S. 1, Barrett was permitted to conduct a pat-down of his outer clothing to feel for weapons. Carter insists, however, that Barrett exceeded the scope of a permissible Terry pat-down by reaching directly into his pants pocket. Carter argues that Barrett lawfully could not reach into his pants pocket unless the detective first conducted a pat-down of the outer clothing and felt what he recognized as contraband. See, e.g.,Minnesota v. Dickerson (1993), 508 U.S. 366. Based on the premise that Barrett reached directly into his pants pocket without first conducting a pat-down from the *Page 5 
outside, Carter contends the detective performed an unlawful search. As a result, he asserts that the trial court should have sustained his suppression motion.
 {¶ 10} Upon review, we find Carter's argument to be unpersuasive. During the suppression hearing, Barrett testified as follows concerning his pat-down of Carter:
 {¶ 11} Q. "Did you pat him down at all?"
 {¶ 12} A. "Yes, I did."
 {¶ 13} Q. "Was he still on the ground when you patted him down or did you have him stand up?"
 {¶ 14} A. "I — I had him stand up."
 {¶ 15} Q. "Once he stood up, describe the patdown for us."
 {¶ 16} A. "I started patting down around his waist area and went into his left pocket of his jeans. I — I immediately felt what I believed to be crack cocaine. I went into his pocket and recovered a baggie of suspected crack cocaine. And when I pulled that baggie out, also a baggie of heroin came out. At that point he was placed — I'd advised him that he was under arrest for possession of drugs." (T. 53) (emphasis added).
 {¶ 17} The foregoing testimony fails to make clear whether Barrett patted Carter's clothing and felt what he recognized as crack cocaine before reaching into the pocket, or whether the detective reached directly into the pocket without patting the outside. The first italicized sentence suggests that Barrett may have reached into the pocket without first feeling the contraband from the outside. The second and third italicized sentences, however, indicate that Barrett may have felt the contraband while conducting an outer pat-down and then reached into Carter's pocket.
 {¶ 18} In State v. Brown (Feb. 9, 1996), Montgomery App. No. 15300, we *Page 6 
recognized that "the State has the burden to prove that an officer who seizes contraband in the course of a Terry weapons pat-down had probable cause to do so because its incriminating nature was immediately apparent." Based on Barrett's testimony, which was ambiguous at best, we do not find that the State met its burden. Nevertheless, as the State notes, Carter failed to raise this issue in the trial court. In his suppression motion, Carter argued (1) that police lacked reasonable, articulable suspicion to conduct a Terry stop, and (2) that the "plain feel" exception did not apply because the drugs in Carter's pocket were not immediately recognizable as contraband. The first argument simply addressed whether police were entitled to conduct a Terry pat-down at all. The second argument addressed only whether Barrett really could have identified the drugs as contraband based on a pat-down of Carter's clothing. Significantly, Carter never claimed that Barrett improperly had reached directly into his pocket without first conducting the pat-down. In fact, Carter expressly asserted the opposite. In his motion to suppress, Carter argued:
 {¶ 19} "In the case at issue, the pat down search revealed somethingthat the detective allegedly believed to be a plastic baggy in Mr.Carter's front pants pocket The detective claims that he was able toidentify `crack cocaine' inside the plastic baggy while conducting thepat down search. He then proceeded to search the pants pocket and remove the plastic baggy and test the contents. The search of Mr. Carter was intrusive and unreasonable in this instance because the nature of the pat down search could not have led to the discovery of something that was imminently apparent as contraband to the officer." (Doc. #11 at 8) (emphasis added).
 {¶ 20} Because Carter never argued below that Barrett unlawfully reached into *Page 7 
his pants pocket without first conducting a Terry pat-down of the area, he has forfeited his ability to raise the issue on appeal. State v.Cullins, Montgomery App. No. 21881, 2007-Ohio-5978, ¶ 10 ("Moreover, the state correctly observes that Cullins did not raise this argument in his motion to suppress, and thus he has waived it for purposes of appeal.");State v. Marks, Montgomery App. No. 19629, 2003-Ohio-4205, ¶ 21 ("Neither Defendant's February 26, 2000, motion to suppress, nor his March 12, 2002, amended motion to suppress, made this particular contention in support of the motion. Neither did the trial court address this issue, much less decide it. Accordingly, this issue is raised for the first time on appeal, and therefore is not properly before us."). The first assignment of error is overruled.
 {¶ 21} In his second assignment of error, Carter challenges the existence of probable cause to arrest him. He contends he was arrested within the meaning of the Fourth Amendment when police removed him from his vehicle at gunpoint and handcuffed him. According to Carter, this level of seizure exceeded a Terry stop and required the existence of probable cause. Carter further asserts that police had no more than reasonable, articulable suspicion of criminal activity when they engaged in the foregoing acts. Therefore, he reasons that he was arrested unlawfully and that the contraband subsequently found in his possession should have been suppressed.
 {¶ 22} Upon review, we find Carter's argument to be without merit. When Detective House approached the Firebird and the GMC Jimmy, his intention was to stop the occupants and to question them about the suspected drug activity he had observed. (T. 44). He did not have the intent to arrest them at that time. (Id. at 45). House drew a gun only after seeing Carter move his hand toward his waistband and hip. House drew *Page 8 
the firearm because he feared Carter might be reaching for a weapon. (Id. at 14-15). For that same reason, he ordered Carter out of the Jimmy, which was occupied by several people. (Id. at 15).
 {¶ 23} When Detective Barrett arrived on the scene, he helped remove Carter from the Jimmy. According to Barrett, Carter was not completely compliant with orders to show his hands and to exit the vehicle. (Id. at 56, 62). After pulling Carter from the vehicle, Barrett decided to handcuff him "[f]or officer safety." Barrett was concerned because he "knew it was a drug investigation" and he "could hear Detective House several times telling Mr. Carter to show his hands[.]" (Id. at 52). These facts led Barrett to fear that Carter might be armed with a weapon. (Id. at 62-63).
 {¶ 24} In our prior Anders ruling, we opined that the officers had reasonable, articulable suspicion to believe Carter had engaged in a drug transaction. Therefore, House and Barrett were justified in approaching Carter's vehicle for purposes of a conducting aTerry stop. In Vandalia v. Armstrong (Aug. 28, 1991), Montgomery App. No. 12581, we recognized that when an officer is entitled to make an investigatory stop, the officer also may take reasonable steps to provide for his own safety. The forcible restraint of a suspect does not necessarily convert a Terry detention into a formal arrest. Id. This is particularly true where the purpose of the restraint is for the officer's safety. See, e.g., State v. Dunson, Montgomery App. No. 20961,2006-Ohio-775, ¶ 17 ("Furthermore, the fact that the officers handcuffed Dunson before frisking him did not convert the investigative stop into an arrest. * * * The question is whether, under the circumstances, the officer's use of force was reasonably necessary to ensure his safety and whether the use of force was limited in scope and duration. * * * Because Dunson *Page 9 
was reaching for his waistband, the detectives feared that he was reaching for a weapon. Thus, the officers were entitled to handcuff Dunson for the investigative stop.").
 {¶ 25} In the present case, House and Barrett had a reasonable basis to fear that Carter might be armed. Carter was suspected of committing a drug offense, a crime that frequently involves armed participants.State v. Evans, 67 Ohio St.3d 405, 413, 1993-Ohio-186. House also had observed Carter make a move toward his waist area, and Barrett had found Carter to be less than compliant. In light of these facts, it was not unreasonable for House to approach the Jimmy with his gun drawn. Nor was it unreasonable for Barrett to remove Carter from the vehicle, which was occupied by several people, and to place him in handcuffs prior to investigating further. We are not convinced that such forcible restraint converted the Terry stop into an unlawful custodial arrest. There was no arrest until after Barrett discovered drugs in Carter's possession. Accordingly, the second assignment of error is overruled.
 {¶ 26} The judgment of the Montgomery County Common Pleas Court is affirmed.
FAIN, J., and WALTERS, J., concur.
(Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio)
Copies mailed to:
Mathias H. Heck, Jr.
Mark J. Keller
Theodore D. Valley
 Hon. Timothy N. O'Connell *Page 1