[Cite as *State v. Fricke*, 2016-Ohio-2747.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO                                        :
                                                     :     Appellate Case No. 26126
    Plaintiff-Appellee/                        :
    Cross-Appellant                            :     Trial Court Case No. 2011-CR-3041
v.                                                   :
                                                     :     (Criminal Appeal from
JOSEPH D. FRICKE                                     :      Common Pleas Court)
                                                     :
    Defendant-Appellant/                       :
    Cross-Appellee                             :

. . . . . . . . . . .

## AMENDED O P I N I O N

Rendered on the 29th day of April, 2016.

. . . . . . . . . . .

H
MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee/Cross-Appellant

BRADLEY S. BALDWIN, Atty. Reg. No. 0070186, Baldwin Valley Law, LLC, 854 East Franklin Street, Centerville, Ohio 45459
    Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Joseph Fricke appeals from his conviction, following a jury trial, for Rape, Possession of Criminal Tools and Contaminating a Substance for Human Consumption or Use. Fricke contends that the trial court erred in overruling his motion to suppress. He further contends that the conviction is not supported by sufficient evidence, and that it is against the manifest weight of the evidence. Finally, Fricke claims the trial court erred by denying his motion for a new trial. The State cross-appeals, contending that the trial court erred by merging the convictions for Rape and Contaminating a Substance for Human Consumption.

{¶ 2} We conclude that the conviction is supported by evidence sufficient to establish the elements of each offense, and that it is not against the manifest weight of the evidence. We further conclude that the trial court did not err by overruling Fricke's motion to suppress or his motion for a new trial. Finally, we conclude that the trial court erred with regard to merger for the purposes of sentencing. Accordingly, the judgment of the trial court is Affirmed in part and Reversed in part, and this cause is Remanded for further proceedings.

## I.     The Alleged Offenses

{¶ 3} The victim, C.C. was a nineteen-year-old student attending a local university. On August 27, 2011, C.C. was in her dormitory; she consumed a mixed drink and approximately one and one-half shots of vodka. At about 11:00 p.m., C.C. and her roommates went to two different houses on campus. During that time, she took a few sips of beer.

{¶ 4}  After midnight, C.C. and her roommates went to a bar, where C.C. began a

conversation with Fricke. The two had never met prior to that encounter. At some point, Fricke offered C.C. a shot to drink. After she drank the shot, Fricke asked her to come home with him to "cuddle and watch a movie." Tr. 364. C.C. stated that she was not interested. Following the shot, C.C. quickly began feeling drunk. Fricke persisted in asking her to go to his house. Eventually, C.C. agreed.

{¶ 5} C.C. left the bar with Fricke, and got into a vehicle with him and four others. At 2:46 a.m., C.C. sent a text message to her friend B.R. that stated, "[i]n car." The vehicle stopped at a house where Fricke picked up his car. At 2:52 a.m., C.C. sent a text message to another friend stating, "7i don't knoe where I am." She texted the friend again a minute later stating, "Im i7n a car i7 don't know." C.C. began to feel "super drunk," and she began to feel scared, and thought she should exit the car. However, when she looked at the door handle, she was unable to remember how to operate it.

{¶ 6} After arriving at Fricke's residence, Fricke prepared a drink of vodka and orange juice. C.C. drank some of the mixed drink. As they went downstairs to Fricke's room, C.C. had trouble negotiating the stairs. She plugged her cell phone into a charger on the bedside table, and noticed that the television, which Fricke had turned on, was a blur.

{¶ 7} At 5:03 a.m., Fricke's cell phone made a call to C.C.'s phone. The call went to voice message, and recorded C.C. saying, "[g]et off of me," "ow," "I don't like this," and "stop." Her voice was slurred. The message also recorded Fricke saying, "[w]hy are you pushing me away." C.C. had no memory of what was occurring at the time the voice message was created.

{¶ 8} Around noon on August 28th, Fricke woke C.C., and drove her back to her

dormitory. She had difficulty walking to, and opening, her dormitory door. Around 12:30, her roommates returned to the room after eating, and found the door unlocked. Believing that C.C. had returned, the roommates began "screaming her name in excitement." Tr. 223. They discovered C.C. in bed sleeping despite the screaming. The roommates tried to wake her, but she was "unable to hold her head up, and her eyes would roll back into her head." Tr. 224. The roommates continued to get her to talk as well as to drink water. One roommate retrieved C.C.'s cell phone, and they all listened to her voice mail. The roommates were disturbed by the voice mail. One roommate sat with C.C. until she woke at about 4:00 p.m.

{¶ 9} When she awoke, C.C. felt "really strange." Tr. 378. She took a shower and had trouble standing. She noticed that a tampon she had inserted the night before was gone. She also had bruising on her legs, and a cut on her lip. At that time, C.C. was "very confused. She had no idea what had happened to her the night before." Tr. 244. The roommates decided to take her to the hospital.

{¶ 10} C.C. arrived at Miami Valley Hospital at 6:41 p.m., where she was examined by a sexual assault nurse examiner. The nurse noted that C.C. had vaginal tenderness. She also had a tear in the rectal area that was consistent with penetration. The nurse took vaginal and rectal swabs. The nurse additionally took blood and urine samples. According to the nurse, blood and urine samples are not normally taken during a sexual assault exam. In this case, the nurse took the samples because C.C's symptoms were consistent with a "drug facilitated assault." Tr. 316.

{¶ 11} The Miami Valley Crime Lab later detected semen on the vaginal swabs, as well as the tampon that the nurse had collected. The lab determined that Fricke's

DNA was on the swabs. C.C.'s DNA was found on four items of Fricke's bedding. The blood and urine were also analyzed. A small trace of alcohol was found in C.C.'s urine; none was detected in her blood. It was also determined that C.C. had a drug known as Lorazepam in her urine and blood. Specifically, she had "50 nanograms per milliter" of the drug in her blood. Tr. 688. According to the toxicologist who examined the blood, the amount of the drug in C.C.'s blood would have been higher prior to the drug draw. The drug produces side effects of confusion, tiredness, slurred speech, lack of coordination, and memory loss.

{¶ 12} The university police were dispatched to the hospital, where they took the initial report. They identified the telephone number that had left the voice message as Fricke's. The investigation was given to the Kettering Police Department. Later the investigating officer found that Fricke had an ongoing case in the Montgomery County Common Pleas Court, and was able to locate Fricke's address from that case information. When it was determined that Fricke's address was located in the City of Dayton, Kettering police contacted the Dayton Police Department regarding the case.

{¶ 13} C.C. was able to identify Fricke's house to Dayton Police Detective William Swisher. On August 31, 2011, Dayton Police Detectives Jerome Dix and Swisher went to Fricke's residence to speak with him. The detectives were in an unmarked police car when they arrived at the home. They spoke to Fricke's roommate, who advised them that Fricke was not home but that he was returning home. Prior to Fricke's return, a Montgomery County Sheriff's Deputy arrived in a marked cruiser. The Deputy informed the detectives that he was there to serve a protection order on Fricke. The Deputy parked away from the residence.

{¶ 14} When Fricke arrived, the detectives made contact with him, and informed him that they were there to conduct an investigation regarding a rape complaint that had been received. Fricke was asked to sit in the back of a police cruiser that had pulled up to the residence. He was seated in the back seat with his feet outside the door. A few minutes later, Dix escorted Fricke to the front of the cruiser. Dix advised Fricke that he was free to go, and that he did not have to speak with the detectives. Dix stated that he needed to ask him some questions regarding the rape allegations. Dix asked Fricke whether he knew C.C. Fricke denied knowing her. Dix then showed Fricke a photograph of C.C. Again, Fricke denied knowing C.C., and stated that he had not seen the woman in the photo. Dix then informed Fricke that his housemates had indicated that Fricke had been with a woman with the same color hair as C.C.; Fricke responded that the woman in the photograph could be the woman he was with on the night in question.

{¶ 15} At that point, the Deputy returned to the residence, and advised Fricke that he was there to serve a protection order. The order was served, and the Deputy walked away. Dix continued to speak to Fricke. The Deputy then approached Swisher and informed him that he also had an arrest warrant for Fricke. When Dix was informed of the warrant, he informed Fricke that he was going to stop the interview because Fricke was going to be taken into custody on the warrant.

{¶ 16} Fricke was transported to the Safety Building by Officer Matthew Kennard. Kennard placed Fricke in interview room 1. Approximately twenty minutes later, Swisher arrived and escorted Fricke to interview room 2, because it had recording capabilities. Fricke asked to contact his lawyer. Fricke was permitted to use two

cellular telephones, as well as an office telephone, to attempt to contact his attorney. After ninety minutes had elapsed without Fricke being able to reach his attorney, Swisher decided to go ahead and book him into jail. Fricke was placed in an interview room that was close to a computer. The room was approximately five feet by six feet in area, and contained a small table with a chair on each side. The door remained open, so that Kennard could communicate with Fricke.

{¶ 17} Kennard began the booking process, asking Fricke only basic identifying questions, such as name, age and weight. During that process, Kennard placed a phone call to Dix, and asked him what specific charges to use in booking. When Kennard repeated the charges back to Dix, Fricke informed Kennard that he wanted to speak with the detectives. Kennard then informed Dix that Fricke wanted to speak to him. Kennard went to the interview room to inform Fricke that the detectives would return. At that point, Fricke informed Kennard that there were two pills on the floor of the interview room. The pills were collected, and later identified as .5 mg Lorazepam.

{¶ 18} Swisher and Dix then returned, and began to speak with Fricke. They reminded him that he did not have to speak to them until he had spoken to his attorney. Fricke advised that he had prior experience being interviewed by the university police. The detectives then executed a pre-interview form with Fricke. Fricke indicated that he understood his rights, and signed the form.

## II. Course of the Proceedings

{¶ 19} Fricke was indicted on one count of Rape (drugs/intoxicants) in violation of R.C. 2907.02(A)(1)(A), one count of Rape (substantially impaired victim) in violation of

R.C. 2907.02(A)(1)(C), one count of Possession of Criminal Tools in violation of R.C. 2923.24(A), and one count of Contaminating a Substance for Human Consumption or Use in violation of R.C. 2927.24(B). He filed a motion to suppress, which was overruled following a hearing. Following a jury trial, Fricke was found guilty on all counts. He filed a motion for new trial, which was overruled. The trial court merged all counts into the count of Rape (drugs/intoxicants), and sentenced Fricke to a seven-year prison term. The trial court designated Fricke a Tier III sex offender.

{¶ 20} Fricke appealed. The State filed a cross-appeal, contending that the trial court erred with regard to the merger of the convictions of Rape and Contaminating a Substance for Human Consumption. This court affirmed the trial court's judgment. *See*, *State v. Fricke*, 2015-Ohio-3389, 40 N.E.3d 705 (2d Dist.). The State has applied to reconsider the issue of merger, pursuant to App.R. 26(A), noting that during the pendency of the appeal, the Supreme Court of Ohio issued its decision clarifying merger issues in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892. The State argues that the decision in *Ruff* mandates reversal of the trial court's decision to merge the convictions. By decision and entry dated November 5th, 2015, Fricke was given time to respond to the application for reconsideration, and did so. We granted the State's application for reconsideration by decision and entry dated April 20, 2016. This amended opinion follows.

**III.    The Trial Court Did Not Err in Overruling Fricke's**

**Motion to Suppress, Because Fricke Was Not**

**in Custody when He Made the Statements in Question**

{¶ 21} Fricke's First Assignment of Error states as follows:

APPELLANT'S MOTION TO SUPPRESS WAS IMPROPERLY OVERRULED BECAUSE HIS STATEMENTS WERE OBTAINED DURING A CUSTODIAL INTERROGATON WITHOUT BEING AFFORDED MIRANDA WARNINGS.

{¶ 22} Fricke contends that the statements made to Dix while at his residence should have been suppressed because he was subjected to a custodial interrogation without being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 23} We begin by noting that this issue was not specifically addressed in his motion to suppress. Instead, the motion dealt with statements made after Fricke was transported to the Safety Building.[1] Thus, the trial court did not address this issue in its decision.

{¶ 24} Under Crim.R. 47, a motion, including a motion to suppress evidence, must "state with particularity the grounds upon which it is made and shall set forth the relief or order sought." If a motion to suppress fails to state a particular basis for relief, that issue is waived and cannot be argued on appeal. *See, e.g.*, *State v. Cullins*, 2d Dist. Montgomery No. 21881, 2007-Ohio-5978, at ¶ 10; *State v. Carter*, 2d Dist. Montgomery No. 21999, 2008-Ohio-2588, at ¶ 20. Thus, we conclude that the issue of Fricke's statements made in his yard was waived.

---

[1] The motion also addressed the matter of whether Fricke was properly arrested, and whether the search warrant for his residence was adequate.

{¶ 25} Even if this matter was not waived for appellate review, we would find it without merit. Suspects do not have a right to warnings under *Miranda* until they are in custody. *State v. Moody*, 2012-Ohio-3390, 974 N.E.2d 1273, ¶ 12 (2d Dist.). Custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. "In order to determine if a person is in custody for purposes of *Miranda*, the court must determine whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Moody*, at ¶ 12. "A seizure equivalent to an arrest exists where there is: (1) an intent to arrest, (2) the seizure is made under real or assumed authority, (3) accompanied by an actual or constructive seizure of the person, and, (4) which is so understood by the person arrested." *Id.*, ¶ 13.

{¶ 26} Although Fricke was seated in the cruiser for a few minutes, the door was left open, and his feet were out. No one attempted to question him while he was seated there. Instead, the questioning occurred outside the cruiser. Fricke was not handcuffed, and he was informed that he was free to leave. He was questioned in a public place, outside his residence. There is no evidence that he was physically or verbally intimidated by any actions of the police. Nor was there any evidence of coercion or trickery. While Fricke spoke to Dix, the other officers were at least twenty feet away. Fricke's roommates were in the residence. In short, there is no evidence that Fricke was in custody at the time Dix questioned him, or that a reasonable person would have believed himself to be in custody, nor was there evidence of coercion.

{¶ 27} Accordingly, the First Assignment of Error is overruled.

**IV.    There Was Probable Cause for the Search Warrant,**

**and the Affidavit in Support of the Search Warrant**

**Did Not Have Materially Misleading Omissions**

**{¶ 28}** Fricke's Second Assignment of Error provides:

APPELLANT'S MOTION TO SUPPRESS WAS IMPROPERLY OVERRULED BECAUSE THE AFFIDAVIT FOR THE SEARCH WARRANT LACKED PROBABLE CAUSE.

**{¶ 29}** Fricke contends that the trial court should have granted his motion to suppress evidence obtained during the execution of the search warrant for his residence. He claims that the affidavit in support of the search warrant did not establish probable cause because it omitted relevant evidence that C.C. had been drinking alcohol throughout the evening, that she only drank part of the drink at his house, and that there was no toxicology or DNA evidence. Fricke argues that this information makes it more likely that C.C. was merely intoxicated from alcohol rather than a drug. He further argues that the fact that she was drinking with others would indicate that other individuals had the opportunity to place a foreign substance in her drinks. He also argues that her prior drinking made her a less credible source.

**{¶ 30}** In "determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons

supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238–239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). When reviewing the sufficiency of probable cause for the issuance of a search warrant, an appellate court should not substitute its judgment for that of the magistrate by conducting a de novo determination of sufficiency. *George*, *supra*, at paragraph two of the syllabus.   Rather, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed," and it "should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant."   *Id.*

**{¶ 31}**  In this case, the affidavit in support of the search warrant does reference the fact that C.C. drank "some of the drink" prepared at Fricke's residence; thus indicating that she did not consume all of the drink.   Thus, this claim is without merit.   There is no evidence that DNA or toxicology evidence existed at the point the affidavit was prepared. However, the affidavit does set forth the fact that C.C. felt she had been drugged. Furthermore, although the affidavit does not indicate C.C. had been drinking prior to meeting Fricke, it does state that C.C. and Fricke were drinking together at a bar, indicating that she consumed alcoholic drinks.   While it is possible that someone else put a drug in one of her earlier drinks, that issue goes to Fricke's defense rather than the sufficiency of the affidavit.

**{¶ 32}** The affidavit indicated that C.C. and Fricke were together at a bar, and that they left the bar together, and went to his residence.   C.C. drank part of an alcoholic drink

that Fricke prepared for her. The affidavit notes that C.C. did not remember anything after going to his bedroom until Fricke woke her up at noon. The affidavit states that C.C. woke in her dorm room feeling nauseated. She did not feel hung over, and thought she had been drugged. She believed that she had been sexually assaulted because the tampon she had inserted the night before was gone. The affidavit further notes the contents of the voice message left on C.C.'s telephone that was traced to Fricke's phone. The call was left by Fricke's phone at 5:03 a.m. on August 28. The affidavit states that C.C. was treated for sexual assault at Miami Valley Hospital. It further notes that C.C. was able to recognize Fricke's residence.

{¶ 33} "A search warrant affidavit that is facially sufficient may nevertheless be successfully attacked if the defendant can show by a preponderance of the evidence that the affiant made a false statement intentionally, or with reckless disregard for the truth." *State v. Stropkaj*, 2d Dist. Montgomery No. 18712, 2001 WL 1468905, *2 (Nov. 16, 2001). The Supreme Court of Ohio has recognized that omissions can be deemed false statements if they are intended to mislead, or made with reckless disregard to the fact that they may mislead the issuing magistrate. *Id.*

{¶ 34} We conclude that the trial court did not err in overruling the motion to suppress. Fricke failed to demonstrate any omission, let alone an omission that would mislead the magistrate. Furthermore, there is sufficient evidence in the affidavit upon which the trial court could rely in finding probable cause to issue the search warrant.

{¶ 35} Fricke's Second Assignment of Error is overruled.

**V.    There Is Evidence in the Record to Support Fricke's Convictions,**

**and they Are Not Against the Manifest Weight of the Evidence**

{¶ 36} Fricke's Third and Fourth Assignments of Error state:

APPELLANT'S CONVICTIONS WERE BASED UPON INSUFFICIENT EVIDENCE PRESENTED AT TRIAL.

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 37} Fricke contends that the conviction is not supported by the evidence. Specifically, he claims the State failed to present evidence sufficient to demonstrate he placed Lorazepam in C.C.'s drinks. He further contends that the conviction is against the manifest weight of the evidence. He argues that C.C. was not a credible witness.

{¶ 38} A sufficiency-of-the-evidence challenge questions whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1992), paragraph two of the syllabus.

{¶ 39} When a conviction is challenged as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all

reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that a substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *5 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 40} The evidence in this case supports a finding that C.C. was in Fricke's presence from the time she met him in the bar until he returned her to her dormitory. Fricke offered her a drink at the bar, following which she began to feel drunk quickly. C.C. testified that she began to feel "super drunk" all of a sudden when she was in the car with Fricke. At that point, she began to feel disoriented. She testified that she was unable to recall how to operate the door handle in the car when she considered getting out of the vehicle. C.C. then went to Fricke's home, where he made her another drink,

which she did not finish. Fricke admitted to the police that C.C. drank at least half of the drink; only a little was left in the glass. After that drink, C.C. had trouble walking, and her vision was impaired. She was also unable to recall the events after she sat on Fricke's bed.

{¶ 41} There is DNA evidence supporting a finding that Fricke had vaginal and anal intercourse with C.C. She had vaginal tenderness, and anal tearing. She was also bruised all along her legs, and had a cut to her lip. While C.C. did not remember having sex, the voice mail left by Fricke's cell phone on C.C.'s cell phone contains statements by C.C. saying stop, and a male voice, which Fricke admitted was his, asking why she was pushing him away.

{¶ 42} Fricke contends that the evidence demonstrates that C.C. was impaired due to drinking prior to meeting him. However, there is evidence in the record upon which the jury could find to the contrary. There is evidence that the next day she only had a small trace of alcohol in her urine, and that there would have been more if she had ingested a large amount of alcohol. Further, C.C. testified that she did not feel drunk until she drank the drink Fricke gave her at the bar. C.C.'s friend corroborated this testimony.

{¶ 43} Evidence was presented that Fricke had a prescription for Lorazepam 1 milligram pills, and that he had previously had a prescription for .5 milligram pills. He admitted that he did not like taking the drug, and that he did not take it every day as prescribed. Thus, the jury could infer that he had extra pills on hand. Furthermore, the evidence showed that Fricke was a paramedic, and had completed a nursing program. Thus, the jury could infer that he was familiar with the effects of the drug. Indeed, the fact

that he texted C.C. at 5:27 p.m. the day he dropped her at her dorm, asking whether she was awake, raises a reasonable inference that he was aware that he knew how impaired she was.

**{¶ 44}** There is also evidence in the record that after Fricke was initially contacted by university police via his cell phone, he sent a text message to a friend that he was "freaking out," and that he thought "that girl is crying rape or something." Furthermore, at the time the police executed the search warrant of Fricke's room, they did not find any Lorazepam, despite the fact that his other prescription medication was present, as well as other medications and supplements. Finally, the police recovered Lorazepam in the interview room that Fricke was placed in while awaiting his interview.

**{¶ 45}** We conclude that the record contains evidence upon which the jury could reasonably rely in concluding that Fricke put Lorazepam in C.C.'s drink. There is evidence upon which a reasonable juror could rely in finding that Fricke possessed Lorazepam with the purpose to administer it to, and with the intent to impair, C.C., and that he did so by placing it in one or both of the drinks he supplied her with the purpose of rendering her incapable of resisting his sexual advances.

**{¶ 46}** We next turn to Fricke's claim that the convictions are against the manifest weight of the evidence. Fricke contends that C.C. was not credible, because she did not initially tell the police about the drink he served her at the bar, and because she had been drinking before meeting him. He further argues that she was drugged after he dropped her off at her dorm.

**{¶ 47}** With regard to the drink at the bar, the State presented the testimony of the bartender, who stated that she had sold a drink that was, as testified to by C.C., red

in color. Thus, the jury was free to find that C.C.'s testimony regarding this was credible. Defense counsel vigorously cross-examined C.C. during trial. The issue is one of credibility, which the jury resolved in C.C.'s favor.

{¶ 48} With regard to Fricke's claim that C.C. was impaired due to drinking, we again note that there was little alcohol in her urine the next day, and both she and her friend testified that she was not impaired due to the drinks she had ingested. Finally, C.C.'s testimony was that she did not become impaired until after the drink at the bar, and that the effects of that drink hit her rapidly. She further testified that once she ingested the drink at Fricke's house she quickly became so impaired that she had difficulty walking and had vision impairment. There was evidence that Lorazepam is an immediate-release drug, and that its effects are felt rapidly. Thus, C.C.'s testimony, which the jury was free to believe, supports a finding that the drug was administered with the drinks given to her by Fricke. From our review of the evidence, we conclude that this is not the exceptional case where a jury has lost its way, resulting in a manifest miscarriage of justice.

{¶ 49} Fricke's Third and Fourth Assignments of Error are overruled.

## VI. The Trial Court Did Not Abuse its Discretion by Overruling Fricke's Motion for a New Trial

{¶ 50} Fricke's Fifth Assignment of Error provides as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY OVERRULING APPELLANT'S MOTION FOR A NEW TRIAL.

{¶ 51} Fricke contends that he is entitled to a new trial because of alleged

irregularities in the jury deliberations. Specifically, he claims that following the verdict, the trial court asked the jury foreman whether the jury found C.C. was drugged at the bar, at Fricke's home, or both. Fricke claims that the foreman responded "that there had been no determination that [Mr. Fricke] did in fact put the drug in [CW's] [sic] drink, only that it was 'logical' that he 'probably' did it."[2] Fricke cites to an affidavit executed by Deena M. DeGroff as evidence of this statement. The State disputes this account.

{¶ 52} Crim.R. 33(A)(2) permits a new trial when a defendant can demonstrate juror misconduct and prejudice stemming therefrom. *State v. Hopfer*, 112 Ohio App.3d 521, 543, 679 N.E.2d 321 (2d Dist. 1996). A trial court's ruling on such a motion will be reversed only for an abuse of discretion. *State v. Herb*, 167 Ohio App.3d 333, 2006-Ohio-2412, 855 N.E.2d 115, ¶ 6 (9th Dist.).

{¶ 53} The trial court was free to determine whether to credit the affidavit of DeGroff. The State did not place any affidavit into the record opposing the affidavit, but did dispute the claim in a memorandum in opposition to the motion for new trial. Of course, the trial judge was present when the foreman answered the court's question regarding the use of the Lorazepam. There is nothing in this record to indicate that the trial court abused its discretion when determining the motion.

{¶ 54} Furthermore, Fricke is seeking to introduce the statement of a juror concerning the jury's deliberative process. However, Evid.R. 606(B) provides that a juror is generally incompetent to testify about the jury's internal deliberations related to the verdict. *State v. Schiebel*, 55 Ohio St.3d 71, 75, 564 N.E.2d 54 (1990). The purpose of this rule is to protect the finality of verdicts and to insulate jurors from harassment by

---

[2] Fricke incorrectly refers to the victim as C.W. throughout his appellate brief.

unsuccessful parties. *Id.* We conclude that the question presented to the juror directly related to the deliberative process, and was therefore not competent.

{¶ 55} The Fifth Assignment of Error is overruled.

**VII.    Based on the Facts in this Case, the Offenses of Contaminating a Substance for Human Consumption and Rape by Means of Impairing the Victim's Judgment by Administering any Drug, Intoxicant, or Controlled Substance Are Not Allied Offenses of Similar Import**

{¶ 56} The State's sole assignment of error states:

CONTAMINATING A SUBSTANCE FOR HUMAN CONSUMPTION AND RAPE UNDER R.C. 2907.02(A)(1)(a) AND (A)(1)(c) ARE NOT ALLIED OFFENSES OF SIMILAR IMPORT.   THE TRIAL COURT ERRED WHEN IT MERGED THOSE OFFENSES FOR SENTENCING.

{¶ 57} At trial, the State conceded that for purposes of sentencing, the two counts of Rape merge.   The State elected to proceed to sentencing on Count I, Rape (drugs/intoxicants), in violation of R.C. 2907.02(A)(1)(a).   The State further conceded that the count of Possession of Criminal Tools merged with the count of Rape.   However, the State contends that the trial court erred by merging the count of Contaminating a Substance for Human Consumption with Rape. In support, the State argues that Fricke's act of putting Lorazepam in C.C.'s drink, with knowledge that she would consume the drink, does not result in the commission of Rape, and that his animus differs for both offenses.   The State further argues that the act of Contaminating a Substance was complete as soon as Fricke placed the drug in the drink, and that by doing so, Fricke

caused a harm, separate and apart from the harm caused by Rape. The State has not cited, nor have we found, any cases discussing this exact issue.

{¶ 58} The merger of offenses is governed by R.C. 2941.25, which provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 59} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, which is the case this court utilized in analyzing the merger issue, offenses are considered to be of similar import when "it is possible to commit one offense and commit the other offense by the same conduct[,] [and] when the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' " *Johnson* at ¶ 48 – 49.

{¶ 60} However, in State v. *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court of Ohio has held that offenses do not merge, and a defendant may be convicted and sentenced for multiple offenses, if any of the following are true: "(1) the offenses are dissimilar in import or significance * * *, (2) the offenses were committed separately, [or] (3) the offenses were committed with separate animus or

conviction." *Id.* at ¶ 25. The Court further opined that two or more offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.*, at ¶ 23.

{¶ 61} Fricke was convicted of R.C. 2907.02(A)(1)(a), which provides that "[n]o person shall engage in sexual conduct with another * * *, when * * * [f]or the purpose of preventing resistance, the offender substantially impairs the other person's judgment or control by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception." Fricke was also convicted of violating R.C. 2927.24(B)(1), which provides that "no person shall * * * [k]nowingly mingle a poison, hazardous chemical, biological, or radioactive substance, or other harmful substance with a food, drink, nonprescription drug, or pharmaceutical product, * * * if the person knows or has reason to know that the food, drink, nonprescription drug, prescription drug, pharmaceutical product or water may be ingested or used by another person."

{¶ 62} The evidence in this case proved that Fricke placed Lorazepam in C.C.'s drink. By knowingly placing the drug in the drink, with knowledge that C.C. was likely to ingest the drink, Fricke completed the element of deceptively and/or surreptitiously administering a drug or controlled substance. By using Lorazepam to substantially impair C.C. and prevent resistance to sexual conduct, Fricke completed the offense of knowingly mingling a chemical substance with a drink. The State's case was based upon the theory that Fricke contaminated C.C.'s drink with a substance that he knew she would ingest, and which he knew would impair her ability to resist any sexual conduct. The

prosecution was based upon the theory that Fricke's conduct was the same for both offenses; both offenses required the conduct of placing the Lorazepam in C.C.'s drink.

**{¶ 63}** In our original opinion, we found that "when Fricke committed this element of Rape, he completed the offense of Contamination, and he did so with a common animus – to reduce his victim's ability to resist his sexual advances. We conclude that these offenses correspond to a sufficient degree that the commission of one offense (the Rape) will result in the commission of the other (Contamination)." *Fricke*, 2015-Ohio-3389, at ¶ 60.

**{¶ 64}** However, given the holding in *Ruff*, we must re-examine the "dissimilar import" aspect of Fricke's offenses. Under *Ruff*, if the harm that results from each offense is separate and identifiable, then the convictions do not merge. Fricke placed Lorazepam into the victim's drink in an amount greater than a therapeutic dose. The victim drank the beverage, and became so highly drugged that she was unable to maintain consciousness. Indeed, she remained asleep for most of the following day, and still had the drug in her system the next evening when she was examined at the hospital. We conclude, then, that one of the harms caused by the administration of the drug – other than being unable to resist the Rape offense – was the victim's inability to maintain consciousness. Because this is a harm separate from having been raped, we conclude that the trial court erred by merging the convictions for sentencing.

**{¶ 65}** The State's sole assignment of error is sustained.

## VIII.   Conclusion

{¶ 66} All of Fricke's assignments of error having been overruled, and the State's sole assignment of error having been sustained, that part of the judgment of the trial court merging the convictions for Rape and Contamination of a Substance for Human Consumption is Reversed, the judgment of the trial court is Affirmed in all other respects, and this cause is Remanded for proceedings consistent with this opinion, including re-sentencing. This opinion supersedes our prior opinion in *State v. Fricke*, 2015-Ohio-3389, 40 N.E.3d 705 (2d Dist.)

. . . . . . . . . . . .


DONOVAN, P.J., and WELBAUM, J., concur.


Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Bradley S. Baldwin
Hon. Timothy N. O'Connell