[Cite as *State v. Cantrel*, 2018-Ohio-3501.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27839 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-3802 |
| | : | |
| DLAQUAN CANTREL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of August, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

MATTHEW M. SUELLENTROP, Atty. Reg. No. 0089655, 6 North Main Street, Suite 400, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Dlaquan Cantrell,[1] appeals from his conviction in the Montgomery County Court of Common Pleas after he pled no contest to possession of heroin and possession of crack cocaine. In support of his appeal, Cantrell contends the trial court erred by failing to suppress evidence that he claims was obtained through an unlawful search and seizure. Cantrell also contends his trial counsel rendered ineffective assistance by failing to challenge the lawfulness of the inventory search conducted on his vehicle. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On December 18, 2015, Cantrell was indicted for possession of heroin in an amount greater than 10 grams, but less than 50 grams, in violation of R.C. 2925.11(A), a felony of the second degree. Cantrell was also indicted for possession of crack cocaine in an amount less than five grams in violation of R.C. 2925.11(A), a felony of the fifth degree. The charges stemmed from allegations that Dayton police officers discovered crack cocaine in Cantrell's vehicle during an inventory search that was conducted after a traffic stop. It was further alleged that the officers discovered heroin on Cantrell's person during a subsequent search incident to arrest.

{¶ 3} Cantrell pled not guilty to the charges and thereafter filed a motion to

---

[1] Defense counsel pointed out at the suppression hearing that the correct spelling of the Defendant's last name is Cantrell. However, many of the documents in the record were filed using an incorrect spelling (Cantrel), and the trial court did not correct the manner in which the case was captioned. Thus, we use the correct spelling in our Opinion, but we have retained the trial court's spelling in the caption of the case. *See* App.R. 3(D) (requiring that, in the notice of appeal, "[t]he title of the case shall be the same as in the trial court * * *.")

suppress on grounds that the drug evidence was discovered as the result of an unlawful search and seizure. On July 29, 2016, the trial court held a hearing on the motion. At the hearing, the State presented testimony from the following three officers with the Dayton Police Department: Officer Michael Saylors, Officer Jonathan Rudy, and Officer Zachary Williams.

{¶ 4} Officers Saylors, Williams, and Rudy each testified that they were part of the Dayton Police Department's Community Problem Response Team. As part of that team, the officers responded to community complaints, which primarily concerned prostitution and drugs. Saylors testified that one of the Dayton communities they served was made up of several apartment complexes near Blackwood Avenue and Radio Road. Saylors indicated that Mt. Crest was an apartment complex located in that area. According to Saylors, Mt. Crest was one of the highest drug areas, noting that there had been over 100 drug arrests made within a two block radius of Mt. Crest over the past three years. Saylors also testified that there was a lot of violent crime in that area.

{¶ 5} With regard to the incident in question, Saylors testified that on December 10, 2015, he was on duty in an unmarked vehicle watching a drug house located at the intersection of Blackwood Avenue and Radio Road. During this time, Saylors was parked on Blackwood Avenue just south of Mt. Crest. Saylors testified that he was facing the intersection with Radio Road when he observed a gray or silver Chevy ("silver Chevy") coming towards him on Blackwood Avenue at 60 to 70 mph. Saylors claimed the posted speed limit was 25 mph and that the silver Chevy "blew" through the intersection, which had four-way stop signs. Saylors testified that he thought the silver Chevy was going to strike his vehicle and that if anyone had driven through the intersection, they would have

been killed.

**{¶ 6}** Continuing, Saylors testified that within seconds of the silver Chevy passing by, a red Dodge travelling at a high rate of speed ran the stop sign at Radio Road as it turned right onto Blackwood Avenue toward Mt. Crest. Saylors testified that based on his experience, it appeared as though the two vehicles were engaged in a chase. After observing the silver Chevy and red Dodge speed through the intersection, Saylors radioed uniformed crews regarding what he saw and advised that the two vehicles were close to Mt. Crest.

**{¶ 7}** Both Officers Rudy and Williams testified that they were in separate cruisers near Blackwood Avenue when Saylors came on the radio and directed them to respond to Mt. Crest due to Saylors observing two cars, a silver Chevy and a red Dodge, speeding and chasing each other toward that area. In video footage from Williams's cruiser camera, Saylors can be heard on the radio directing the officers to Mt. Crest, describing the vehicles he observed, and pointing out the vehicles. *See* State's Exhibit 3.

**{¶ 8}** Officer Williams testified that he responded to Mt. Crest shortly after receiving the information from Saylors. Williams testified that he attempted to stop the silver Chevy, but it fled the scene. The video footage from Williams's cruiser camera shows that Williams briefly followed the silver Chevy; however, Williams testified that he did not continue to pursue the vehicle due to Dayton Police Department policy. Williams then returned to assist Officer Rudy, who was in the process of conducting a traffic stop on the red Dodge.

**{¶ 9}** Officer Rudy testified that he arrived at Mt. Crest within a minute of receiving the information from Saylors. Rudy testified that he stayed with the red Dodge while

Williams attempted to conduct a traffic stop on the silver Chevy. Rudy testified that he ordered the driver of the red Dodge, Cantrell, out of the vehicle with his firearm drawn and placed Cantrell in handcuffs. Rudy testified that Williams then returned to assist him with the traffic stop.

{¶ 10} Upon returning to assist Rudy, Williams asked Cantrell if he had a driver's license, to which Cantrell responded he did not. Because Cantrell did not have a driver's license, Rudy testified that he decided to have Cantrell's vehicle towed. Rudy further testified that Cantrell was not the registered owner of the vehicle, as the vehicle was a rental car. Under these circumstances, Rudy testified that it is the Dayton Police Department's policy to tow and impound the vehicle. At the suppression hearing, Rudy identified a written copy of the Dayton Police Department's tow policy, which was admitted into evidence as State's Exhibit 1.

{¶ 11} Given that Cantrell's vehicle was going to be towed, Rudy testified that he conducted an inventory search of the vehicle. During the search, Rudy testified that he found crack cocaine in the glove compartment. Rudy secured the crack cocaine and took it to Williams, who was speaking with Cantrell in his police cruiser. Thereafter, Williams advised Cantrell that he was under arrest for drug possession and read him his *Miranda* rights.

{¶ 12} Sometime later, Officer Rudy removed Cantrell from the back of the cruiser and conducted a search incident to arrest. Rudy testified that, as he was searching over Cantrell's clothes, he felt something between Cantrell's buttocks. Rudy testified that as soon as he felt something in that area, Cantrell clinched his buttocks. Rudy testified that, in his experience, offenders clinch their buttocks in an attempt to conceal illegal

contraband that is hidden there.

{¶ 13} In the cruiser camera footage, the officers can be heard asking Cantrell what he was hiding. At one point, Cantrell admits: "There's something down there." State's Exhibit 3, minute mark 17:45:37. Rudy testified that he and Williams then had Cantrell jump up and down, and that the item fell into Cantrell's underwear. Rudy testified that he removed the item from Cantrell's underwear, and that based on his training and experience, he identified the item as heroin in a plastic baggie. Cantrell was then transported to jail.

{¶ 14} After considering the testimony and evidence presented at the suppression hearing, as well as the parties' post-hearing memorandums, the trial court issued a decision and entry overruling Cantrell's motion to suppress. Shortly thereafter, Cantrell pled no contest to the indicted charges. The trial court then found Cantrell guilty of the charges and sentenced him to an aggregate prison term of three years.

{¶ 15} Cantrell now appeals from his conviction, raising five assignments of error for review.

**First, Second, Third, and Fourth Assignments of Error**

{¶ 16} For purposes of clarity, we will address Cantrell's first four assignments of error together, as they all challenge the trial court's decision overruling his motion to suppress. The four assignments of error are as follows:

I.      THE TRIAL COURT COMMITTED ERROR IN OVERRULING APPELLANT'S MOTION TO SUPPRESS AS THE INITIAL STOP OF THE VEHICLE LACKED REASONABLE, ARTICULABLE

SUSPICION OF CRIMINAL ACTIVITY.

II.    THE TRIAL COURT COMMITTED PLAIN ERROR IN OVERRULING APPELLANT'S MOTION TO SUPPRESS BECAUSE THERE WAS AN UNLAWFUL ARREST WITHOUT PROBABLE CAUSE.

III.    THE COURT COMMITTED ERROR IN OVERRULING APPELLANT'S MOTION TO SUPPRESS AS THERE WAS NO VALID IMPOUNDMENT OF THE VEHICLE AND THE SUBSEQUENT SEARCH OF THE VEHICLE WAS UNLAWFUL AND PRETEXTUAL.

IV.    THE INVENTORY SEARCH WAS INVALID BECAUSE THE DAYTON REVISED CODE OF GENERAL ORDINANCES, SECTION 76.07-76.08, AND THE DAYTON POLICE DEPARTMENT'S TOW POLICY ARE WHOLLY DISCRETIONARY AND THEREFORE UNCONSTITUTIONALLY VAGUE AS A BASIS FOR THE INVENTORY EXCEPTION TO THE WARRANT REQUIREMENT.

{¶ 17} Under the foregoing four assignments of error, Cantrell argues that the trial court erred in overruling his motion to suppress because the traffic stop, his arrest, and the inventory search of his vehicle all violated his Fourth Amendment right to be free from unreasonable searches and seizures. Specifically, Cantrell argues that: (1) Officers Rudy and Williams lacked a reasonable, articulable suspicion of criminal activity to justify conducting a traffic stop; (2) the officers arrested him without probable cause; (3) the

inventory search of his vehicle was an unlawful, pretextual search because there was no legitimate basis to tow and impound his vehicle; and (4) the inventory search of his vehicle was invalid because the municipal ordinance governing impoundment, R.C.G.O. 76.08(C), and the Dayton Police Department's tow policy are unconstitutionally vague.

*Standard of Review*

{¶ 18} "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "As a result, when we review suppression decisions, 'we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' " *Id.*, quoting *Retherford*.

*The Traffic Stop*

{¶ 19} Under his First Assignment of Error, Cantrell contends that he was unlawfully detained by Officers Rudy and Williams during the traffic stop in question because the officers lacked a reasonable, articulable suspicion that he had engaged in criminal activity. We disagree.

{¶ 20} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable

searches and seizures." (Citation omitted.) *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7. "Stopping an automobile constitutes a 'seizure.' " *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 16, citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "[A] police officer may lawfully stop a vehicle if the officer has a reasonable articulable suspicion that the operator has engaged in criminal activity, including a minor traffic violation." *State v. Hardy*, 2d Dist. Montgomery No. 24114, 2011-Ohio-241, ¶ 20, citing *Mays* at ¶ 7-8.

{¶ 21} In determining whether there was a reasonable, articulable suspicion to stop and detain a motorist, the court must evaluate the "totality of the circumstances." (Citations omitted.) *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14. "These circumstances must be considered 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. White*, 2d Dist. Montgomery No. 18731, 2002 WL 63294, *2 (Jan. 18, 2002), quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 22} "Under [the collective knowledge] doctrine, 'police officers may develop the reasonable suspicion necessary to effect a search or seizure based on information obtained and relayed by fellow officers.' " *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 30 (2d Dist.), quoting *United States v. Chambers*, 638 Fed.Appx. 437 (6th Cir.2015), fn. 4. (Other citations omitted.) *Accord State v. Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20 (the collective knowledge doctrine "permits police officers to rely on information provided to them by other officers in helping to establish probable cause or reasonable suspicion"). "Reasonable suspicion may exist based upon the collective

knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information." *State v. Mook*, 9th Dist. Wayne No. 97CA0069, 1998 WL 417461, *3 (July 15, 1998), quoting *United States v. Allison*, 616 F.2d 779, 782 (5th Cir.1980). *Accord Ojezua* at ¶ 30.

**{¶ 23}** In this case, Officer Saylors testified that while he was sitting in his vehicle conducting surveillance on a drug house, he observed a silver Chevy run through a stop sign at the intersection of Blackwood Avenue and Radio Road. Saylors testified that the silver Chevy was traveling 60 to 70 mph in a 25 mph zone and that it almost struck his vehicle. Saylors also testified that a few seconds after the speeding silver Chevy ran the stop sign, he observed a red Dodge run through a stop sign at the same intersection as it turned onto Blackwood Avenue at a high rate of speed. Given his experience and observations, Saylors testified that he believed the vehicles were engaged in a chase. Saylors testified that he relayed his observations to Officers Rudy and Williams over the radio and advised that the two vehicles were headed toward Mt. Crest. Both Rudy and Williams testified that Saylors had directed them over the radio to respond to Mt. Crest due to Saylors's observation of two cars, a silver Chevy and a red Dodge, speeding and chasing each other toward that area.

**{¶ 24}** Based on Saylors's testimony, we find that Saylors had a reasonable, articulable suspicion that the two vehicles he observed were engaged in criminal activity by committing multiple traffic violations. The record indicates that Saylors communicated his observations of the traffic violations over the radio to Officer Rudy, who initiated the traffic stop, and to Officer Williams, who assisted with the traffic stop. Under these circumstances, the collective knowledge doctrine applies and imputes Saylors's

reasonable suspicion to Rudy and Williams. Given their collective knowledge, the traffic stop was not in violation of the Fourth Amendment.

{¶ 25} Cantrell, however, argues that the record does not establish that Rudy knew it was Cantrell's red Dodge that Saylors was referring to when Saylors was communicating the traffic violations over the radio. Cantrell contends that Rudy's testimony indicates that Rudy did not receive Saylors's description of the offending vehicles before he initiated the traffic stop, and therefore knew nothing about a red Dodge at the time of the stop.

{¶ 26} Officer Rudy testified as follows:

A.     Officer Saylors came over the radio on our channel and directed us to get up to Mount Crest area. He said there were two cars that were traveling at a high rate of speed. He thought they—he sounded—he told us to get up there in a hurry. He said he thought they might be chasing each other, something like that. And as soon as we got up there that's when we made contact with the two vehicles that were up there.

\* \* \*

Q.     Okay. And what do you observe when you get there?

A.     When I got there I observed two cars, there was a silver, I believe it was a Chevy, and then there was a red Dodge, they're both cars. The silver Chevy Officer Williams attempted to make a traffic stop on that, as soon as he did it fled the area. It went back going south, and then I stayed with the red Dodge.

Q.     Okay.  And did Officer Saylors actually point out—was he able to point out to you—to you and Officer Williams the two vehicles he was referring to earlier?

A.     Yeah, he described over the radio a silver Chevy and then a red Dodge.

Trans. (July 29, 2016) p. 47-48.

{¶ 27} The foregoing testimony from Rudy indicates that he responded to a radio call by Saylors regarding two vehicles that Saylors observed speeding and chasing each other.   According to Cantrell, Rudy's testimony is unclear as to when Saylors described the red Dodge as one of the offending vehicles.   However, the record as a whole indicates that Saylors described the red Dodge before Rudy initiated the traffic stop.   This fact was established by Saylors's testimony and by the video footage taken from Williams's cruiser camera.   Saylors's testimony indicates that he radioed the other officers a description of the vehicles right after the red Dodge sped by him and that he pointed out the vehicles while they were in the Mt. Crest parking lot.   *See* Trans. p. 21-22, 26.   In the video footage, Saylors can be heard on the radio describing one of the vehicles as a "red Dodge Dart" well before Cantrell was pulled over.   *See* State's Exhibit 3, minute mark 17:03:48.   Accordingly, the record as a whole establishes that Rudy had knowledge that Saylors observed a red Dodge commit a traffic violation before initiating the traffic stop.

{¶ 28} We further note that despite Saylors's description of the red vehicle as a Dodge Dart as opposed to the model of Cantrell's vehicle, a Dodge Charger, the record indicates that Rudy stopped the correct vehicle.   Saylors testified that the red Dodge he

observed commit the traffic violations backed into a parking space in the Mt. Crest parking lot. Williams also testified that he observed the red Dodge in question backing into a parking space in the Mt. Crest parking lot. The video footage from Williams's cruiser camera shows that Cantrell was in the process of backing his red Dodge Charger into a parking space right next to the silver Chevy just before the silver Chevy fled the scene. In addition, both Saylors and Williams testified that a Dodge Dart and a Dodge Charger are similar in appearance, and Saylors confirmed that he learned the red Dodge he saw was a Charger, not a Dart.

{¶ 29} For the foregoing reasons, Cantrell's First Assignment of Error is overruled.

*The Arrest*

{¶ 30} Under his Second Assignment of Error, Cantrell argues that even if he was lawfully detained for traffic violations, he was unlawfully arrested without probable cause. Specifically, Cantrell claims that the traffic stop converted into an unlawful arrest when Officer Rudy ordered him out of his vehicle at gunpoint and handcuffed him and when Officer Williams placed him in back of his police cruiser.

{¶ 31} "An arrest occurs when the following four requisite elements are involved: (1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." (Citations omitted.) *State v. Darrah*, 64 Ohio St.2d 22, 26, 412 N.E.2d 1328 (1980). *Accord State v. Turic*, 2d Dist. Greene No. 2010 CA 56, 2011-Ohio-6713, ¶ 13. "The evidence must show that the subject of an arrest should reasonably have understood that such a seizure occurred." *In re B.M.*, 2d Dist. Montgomery Nos.

25093, 25206, 2012-Ohio-6221, ¶ 14, citing *State v. Hatch*, 2d Dist. Montgomery No. 18986, 2002 WL 10449 (Jan. 4, 2002).

{¶ 32} "The forcible restraint of a suspect does not necessarily convert a *Terry* detention into a formal arrest." (Citation omitted.) *State v. Carter*, 2d Dist. Montgomery No. 21999, 2008-Ohio-2588, ¶ 24, referencing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[W]hen an officer is entitled to make an investigatory stop, the officer also may take reasonable steps to provide for his own safety." *Id.* "The question is whether, under the circumstances, the officer's use of force was reasonably necessary to ensure his safety and whether the use of force was limited in scope and duration." (Citations omitted.) *State v. Dunson*, 2d Dist. Montgomery No. 20961, 2006-Ohio-775, ¶ 17.

{¶ 33} " 'When judging the reasonableness of the officer's actions, courts must focus on the totality of the circumstances from an objective standpoint.' " *State v. Williams*, 2d Dist. Montgomery No. 22601, 2008-Ohio-5511, ¶ 15, quoting *State v. Molette*, 2d Dist. Montgomery No. 19694, 2003-Ohio-5965, ¶ 11. " '[T]hese circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *Molette* at ¶ 11, quoting *Andrews*, 57 Ohio St.3d 86 at 87-88, 565 N.E.2d 1271.

{¶ 34} In this case, Officer Rudy testified that he approached Cantrell's vehicle with his firearm drawn, ordered Cantrell out of his vehicle, and handcuffed Cantrell for purposes of officer safety. Rudy testified that at the time he approached Cantrell's vehicle, he was the only officer at the scene and that he was in a high crime, high drug area. Rudy further indicated that he was concerned Cantrell might have a weapon

because the silver Chevy and Cantrell's red Dodge were traveling at a high rates of speed, possibly chasing one another, and because the silver Chevy had fled the scene upon seeing the officers. Rudy further indicated that Saylors sounded frantic over the radio when reporting the vehicles' conduct. When viewing these circumstances through the eyes of a reasonable, prudent police officer, we find that Rudy's actions were reasonable.

{¶ 35} As a further matter, the record indicates that Cantrell understood he was not under arrest at the time he was detained in the back of Officer Williams's police cruiser. The video evidence established that Williams did not initially read Cantrell his *Miranda* rights, but simply explained that Cantrell had almost hit someone, i.e., Saylors. State's Exhibit 3, minute mark 17:06:25. Williams then told Cantrell that he was writing a ticket. *Id.* at 17:09:40. Thereafter, Cantrell asked: "Sir, am I going to jail?" and Officer Williams responded: "No." *Id.* at 17:10:30.[2] *Contrast State v. Williamson*, 2d Dist. Montgomery No. 25479, 2014-Ohio-325, ¶ 24 ("it is arguable that [defendant] was immediately arrested when [the officer] stopped him at gunpoint, placed him in handcuffs, and put [him] in another officer's cruiser; [defendant] was not questioned, he was given *Miranda* warnings, and there was no testimony that [defendant] was told that he was not under arrest, despite the officers' actions").

{¶ 36} Even if the officers' conduct in question had constituted an arrest without probable cause, Cantrell has failed to establish what evidence should be suppressed as a result. The warrantless search of Cantrell's vehicle that yielded crack cocaine was

---

[2] Prior to telling Cantrell he was not going to jail, Williams mistakenly told Cantrell that there was a warrant for his arrest. The warrant was actually for Cantrell's twin brother, Daveon Cantrell. Williams, however, realized the mistake shortly thereafter and advised Cantrell that he did not in fact have a warrant for his arrest.

conducted as an inventory search due to Cantrell's vehicle being towed, not a search incident to arrest. Once the officers discovered the crack cocaine during the inventory search, the officers had probable cause to arrest Cantrell. Thereafter, the officers lawfully searched Cantrell as a search incident to arrest and discovered heroin on his person. Therefore, none of the drug evidence was discovered as a result of the officers ordering Cantrell out of his vehicle at gunpoint, handcuffing him, and placing him in back of a police cruiser. All the drug evidence was discovered via lawful searches regardless of whether the officer's initial conduct amounted to an arrest without probable cause.

{¶ 37} For the foregoing reasons, Cantrell's Second Assignment of Error is overruled.

*The Inventory Search*

{¶ 38} Under his Third Assignment of Error, Cantrell argues that the inventory search of his vehicle was a mere pretext for conducting a warrantless evidentiary search because there was no legitimate basis to tow and impound his vehicle. Cantrell also argues, under his Fourth Assignment of Error, that the inventory search was invalid because the Dayton Police Department's tow policy and the municipal ordinance governing the impoundment of vehicles are unconstitutionally vague. We disagree.

{¶ 39} "It is well settled that the 'inventory exception' to the warrant requirement of the Fourth Amendment permits the police to conduct a warrantless search to produce an inventory of the contents of an impounded vehicle." *State v. Pullen*, 2d Dist. Montgomery No. 24620, 2012-Ohio-1858, ¶ 13, citing *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) and *State v. Mesa*, 87 Ohio St.3d 105, 108-109,

717 N.E.2d 329 (1999). "The rationale for excluding inventory searches from the warrant requirement is that inventory searches are an administrative or caretaking function, rather than an investigative function." *State v. Myrick*, 2d Dist. Montgomery No. 21287, 2006-Ohio-580, ¶ 11, citing *Opperman* at 370. "[A]n inventory search is deemed to be constitutionally permissible in the absence of a warrant because it reasonably serves to protect the owner's property while it is in police custody, to protect police against claims concerning lost or stolen property, and to protect police and the public against potential hazards posed by the impounded property." *Id*. at ¶ 12, citing *Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

{¶ 40} " 'In order for police to perform a valid inventory search of an automobile, the vehicle must first be lawfully impounded.' " *State v. Jackson*, 2d Dist. Montgomery No. 25960, 2015-Ohio-3607, ¶ 14, quoting *State v. Clancy*, 2d Dist. Montgomery No. 18844, 2002 WL 628124, *3 (April 19, 2002). "An impoundment is lawful if it is conducted pursuant to standardized police procedures. * * * Standardized procedures for impoundment are required to ensure that a subsequent inventory search is not 'a ruse for general rummaging in order to discover incriminating evidence.' " *Clancy* at *3, quoting *Wells* at 4. Accordingly, "a routine inventory search of a lawfully impounded automobile is not unreasonable within the meaning of the Fourth Amendment when performed pursuant to standard police practice, and when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded automobile." *State v. Robinson*, 58 Ohio St.2d 478, 480, 391 N.E.2d 317 (1979), citing *Opperman* at 373.

{¶ 41} "A police officer's assertion that an inventory search was done pursuant to

a police department policy is not sufficient, standing alone, to meet the State's burden of proving that a warrantless search was reasonable because it fits within the inventory search exception to the warrant requirement." *Myrick* at ¶ 13, citing *State v. Wilcoxson*, 2d Dist. Montgomery No. 15928, 1997 WL 452011, *4 (July 25, 1997). To establish a lawful inventory search based on standard police practice, " 'the evidence presented must demonstrate that the police department has a standardized, routine policy, demonstrate what that policy is, and show how the officer's conduct conformed to that policy.' " *Id.,* quoting *Wilcoxson* at *4.

{¶ 42} In the present case, Officer Rudy testified that Cantrell's vehicle was towed pursuant to Section I(A) of the Dayton Police Department's tow policy because Cantrell did not have a driver's license. A written copy of the tow policy was identified by Rudy at the suppression hearing and admitted into evidence. Section I(A) of the tow policy states as follows:

**I. WHEN TO TOW A VEHICLE** (* * *)

A. Driver/Owner Arrested: Vehicles operated by drivers without an operator's license, while under suspension, operating while under the influence or where the vehicle was used in the commission of a crime should preferably be towed from where they were stopped, including private property. (see also General Order 3.02-2 Section III.F.) If an officer elects not to tow the vehicle and leave it legally parked, a Tow–In/Liability Waiver (Form F-472) must be completed by the operator/registered owner of the vehicle.

1. If the driver is the registered owner or the registered owner is on the

scene and gives permission to another properly licensed driver to drive their vehicle, the officer may release the vehicle rather than tow it.

2. If the vehicle is towed, officers should make reasonable efforts to assure that the driver and other occupants are dropped off at a safe location until legal transportation can be obtained.

3. RCGO [Dayton Revised Code of General Ordinances] 76.08 describes circumstances, which allow a vehicle to be impounded due to an arrest. It states, in part, "*Members of the Police Department are authorized to remove or direct the removal of a vehicle under any of the following circumstances... (C) Arrest and detention of driver. Whenever the driver or person in charge of any vehicle is placed under arrest and taken into custody and detained by police under circumstances which leaves or will leave a vehicle unattended.*"

(Boldface, underlining, and italics in original.) State's Exhibit 1.

**{¶ 43}** The aforementioned tow policy permits Dayton police officers to tow "[v]ehicles operated by driver's without an operator's license." Cantrell, however, contends that Rudy was unaware of the fact that he did not have a driver's license at the time Rudy initiated the inventory search. Therefore, according to Cantrell, there was no legitimate basis to tow his vehicle at the time the inventory search was conducted, making the inventory search unlawful and a mere pretext for an evidentiary search. Cantrell's claim is not supported by the record.

**{¶ 44}** The video evidence establishes that after Rudy initiated the traffic stop and ordered Cantrell out of his vehicle, Officer Williams approached Cantrell and asked, in

Rudy's presence, whether Cantrell had a driver's license. In response, Cantrell replied: "No sir, definitely don't." State's Exhibit 3, minute mark 17:05:30. After providing the officers with this information, the video shows Williams taking Cantrell to his cruiser for purposes of issuing a citation. Shortly thereafter, Rudy begins searching the interior of Cantrell's vehicle with a flashlight.

{¶ 45} Midway through Rudy's search, the video footage shows that Rudy returned to Williams's cruiser to confirm that Cantrell did not have a driver's license, and then tells Williams: "We're towing." *Id.* at 17:08:49. Although Rudy had already started searching before making this statement to Williams, the video evidence clearly shows that Cantrell advised the officers that he did not have a driver's license before Rudy began to search the vehicle. Williams testified, and we agree, that Rudy was permitted to conduct an inventory search based on Cantrell's statement that he did not have a driver's license. Regardless, no contraband was discovered during Rudy's initial search. The crack cocaine in Cantrell's vehicle was found after Rudy confirmed Cantrell's statement that he did not have a driver's license.

{¶ 46} Because Cantrell also advised the officers that his vehicle was a rental, *see Id.* at 17:05:29 and Trans. p. 51 and 91, the registered owner was not present at the scene to take or give possession of the vehicle as permitted by Section I(A)(1) of the tow policy. The officers' testimony and the tow policy admitted into evidence establish that towing a vehicle under such circumstances is a standardized, routine practice of the Dayton Police Department. Accordingly, we cannot say the inventory search was a mere pretext for an evidentiary search.

{¶ 47} Contrary to Cantrell's claim otherwise, we also cannot say that the Dayton

Police Department's tow policy or the municipal ordinance governing the impoundment of vehicles, R.C.G.O. 76.08, is unconstitutionally vague. "[W]hen a statute is challenged under the due process doctrine of vagueness, a court must determine whether the enactment (1) provides sufficient notice of its proscriptions and (2) contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement." *Perez v. Cleveland*, 78 Ohio St.3d 376, 378, 678 N.E.2d 537 (1997), citing *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). *Accord Dayton v. Smith*, 2018-Ohio-675, ___N.E.3d___, ¶ 21 (2d Dist.).

{¶ 48} Section (C) of R.C.G.O. 76.08 provides that:

Members of the Department of Police are authorized to impound, immobilize, remove, or direct the removal of a vehicle under any of the following circumstances: * * *

(C) *Arrest and detention of driver.* Whenever the driver or person in charge of any vehicle is placed under arrest and taken into custody and detained by police under circumstances which leaves or will leave a vehicle unattended.

(Emphasis sic.)

{¶ 49} Cantrell argues that R.C.G.O. 76.08(C) and the tow policy in question "invite[ ] official arbitrariness and potential discriminatory enforcement" because they provide police officers with "blanket discretion" on when to tow a vehicle, thus making the decision to tow "wholly discretionary." In support of this claim, Cantrell cites our decision in *State v. Bozeman*, 2d Dist. Montgomery No. 19155, 2002 WL 1041847 (May 24, 2002), wherein we held that a wholly discretionary tow policy that gave police officers unfettered

discretion to tow a vehicle did not constitute a standardized, routine policy or practice that did not offend the Fourth Amendment. *Id.* at \*4.

{¶ 50} However, in *State v. Favors*, 2d Dist. Montgomery No. 24921, 2012-Ohio-3596, we analyzed the exact same Dayton Police Department tow policy at issue here and found that it was not wholly discretionary. Specifically, this court held that:

> Although that policy leaves some discretion to the officer on the scene, it establishes a discernible set of criteria upon which to base that discretion. Furthermore, paragraph I(A)(1) of the policy implies that unless a registered owner on the scene is either going to be the driver of the vehicle, or gives permission to another properly licensed driver to drive the vehicle, the officer may not release the vehicle rather than tow it; i.e, there is no discretion not to tow the vehicle unless that circumstance obtains.

*Id.* at ¶ 15.

{¶ 51} In this case, Rudy and Williams's decision to tow Cantrell's vehicle was based on the fact that Cantrell did not have a driver's license and the registered owner of the vehicle was not present due to the vehicle being a rental car. Pursuant to Section I(A)(1) of the Dayton Police Department's tow policy, without the registered owner being present, the officers had no discretion to release the vehicle; rather, the vehicle had to be towed. Accordingly, the tow policy was not wholly discretionary. As a result, Cantrell's vagueness argument lacks merit.

{¶ 52} For the foregoing reasons, Cantrell's Third and Fourth Assignments of Error are overruled.

**Fifth Assignment of Error**

{¶ 53} Cantrell's Fifth Assignment of Error is as follows:

THE APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL PURSUANT TO ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

{¶ 54} Under his Fifth Assignment of Error, Cantrell argues that his trial counsel was ineffective in failing to challenge the validity of the inventory search on grounds that it was a pretext for an evidentiary search and was based on an unconstitutionally vague tow policy and municipal ordinance.

{¶ 55} In order to succeed on his ineffective assistance claim, Cantrell must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 56} To establish deficient performance, Cantrell must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688; *Bradley* at 142. To establish prejudice, Cantrell must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688; *Bradley* at paragraph two of the syllabus.

{¶ 57} In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31, citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

{¶ 58} "An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). "The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable." *Id.*, citing *Strickland*. "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *Id.*, citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *Id.*, citing *Cook* at 524.

{¶ 59} Contrary to Cantrell's claim otherwise, his trial counsel did challenge the validity of the inventory search, albeit very generally, in Cantrell's motion to suppress. *See* Motion to Suppress (Jan. 26, 2016), Montgomery C.P. No. 2015-CR-3802, Docket No. 18, p. 2 ("officers from the Dayton Police Department conducted a warrantless search

of a vehicle * * * with no proper basis for doing so * * *"). *See also* Trans. p. 5. However, following the suppression hearing, Cantrell's trial counsel filed a supplemental memorandum in support of his motion to suppress that focused solely on the lawfulness of the traffic stop and the search of Cantrell's person. *See* Supplemental Memorandum in Support of Defendant's Motion to Suppress (Sept. 8, 2016), Docket No. 34. Therefore, Cantrell's trial counsel was aware that the validity of the inventory search was a potential issue, but chose not to focus on that issue following the suppression hearing. This was a decision concerning trial strategy that cannot form the basis of an ineffective assistance claim. As previously noted, "[a]n appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." (Citation omitted.) *Conley* at ¶ 56.

**{¶ 60}** Regardless, even if counsel's performance had been deficient, Cantrell has failed to demonstrate that the outcome of the suppression proceedings would have been different had his counsel pursued the arguments concerning the validity of the inventory search. A change in outcome is speculative and highly unlikely given that we have already addressed the arguments at issue and concluded that the inventory search was lawful. Therefore, Cantrell was not prejudiced by his counsel's failure to raise those arguments during the suppression proceedings. As a result, his ineffective assistance claim fails.

**{¶ 61}** For the foregoing reasons, Cantrell's Fifth Assignment of Error is overruled.

## Conclusion

**{¶ 62}** Having overruled all five assignments of error raised by Cantrell, the

judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Matthew M. Suellentrop
Hon. Dennis J. Langer