[Cite as *State v. Quinones*, 2024-Ohio-2552.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29894 |
| | : | |
| v. | : | Trial Court Case No. 21TRC1334 |
| | : | |
| EDWIN RODRIGUEZ QUINONES | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on July 3, 2024

. . . . . . . . . . .

ADDIE J. KING, Attorney for Appellant

MARC T. ROSS, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Edwin Rodriguez Quinones appeals from his conviction in the Dayton Municipal Court, following his no contest plea, of operating a motor vehicle while under

the influence ("OVI"). For the reasons that follow, the judgment of the municipal court is affirmed.

## Facts and Procedural History

{¶ 2} Quinones was cited on February 20, 2021, for five offenses: two counts of OVI, a seat belt violation, a marked lanes violation, and a stop sign violation. He pled not guilty. After being found competent to stand trial, Quinones filed a motion to suppress. The motion argued that 1) the arresting officer did not properly administer field sobriety tests and therefore lacked probable cause for the arrest, 2) a blood test was not properly completed and thus the results were subject to suppression, and 3) he was not advised of his rights prior to being detained.

{¶ 3} A suppression hearing was held on April 25, 2022, and post-hearing briefs were filed. The court then overruled the motion to suppress. Quinones subsequently entered no contest pleas to the two OVI counts in exchange for the dismissal of the three other misdemeanors. The court found him guilty of the OVIs, merged the OVI offenses, and proceeded to sentencing pursuant to R.C. 4511.19(A)(1)(a). The court sentenced Quinones to 180 days in jail, with 177 suspended, and ordered him to complete a three-day alcohol intervention program. The court also sentenced Quinones to one year of non-reporting community control sanctions and a fine of $375 plus court costs, and it imposed a one-year driver's license suspension.

{¶ 4} Quinones asserts six assignments of error on appeal. Before addressing them, we will review the evidence presented at the suppression hearing and the court's decision on the motion to suppress.

**Suppression Hearing**

{¶ 5} Three witnesses testified for the State at the suppression hearing. Jenni Johnson, a phlebotomist at CompuNet Clinical Laboratories, worked at Miami Valley Hospital in February 2021 and performed a blood draw on Quinones at the request of law enforcement after his arrest. Johnson testified that she had performed several hundred such blood draws, and she used a specific kit for this purpose. The kit included two "very specific" glass tubes with gray stoppers which contained an anticoagulant, an iodine patch for cleaning the area of the blood draw, a bag to hold the samples, labels, and chain of custody paperwork. A sterile needle was used to obtain the blood. The labels were completed with the requesting officer's name, the patient's name, the date and time of the blood draw, and the phlebotomist's signature. The tubes were sealed after the draw. Johnson's practice was to confirm the identity of the patient after speaking to the requesting officer. After Quinones's blood was obtained, the kit was sealed in its original box, Johnson initialed the seals, and she returned the box to the requesting officer. She identified the kit she completed for Quinones on February 21, 2021, at 12:07 a.m.

{¶ 6} Elizabeth Kiely, a forensic toxicologist at the Miami Valley Reginal Crime Laboratory with 25 years of experience, testified that Philip Quinton Carter, Kialee Boles, and Trina Redmond, who were qualified forensic toxicologists at the lab, tested the samples of Quinones's blood. A screen and a confirmation test were performed. A screen is a qualitative test, the results of which are either positive or negative for the presence of alcohol, and a confirmation test provides a value for a positive result. Confirmation equipment is calibrated prior to use. After the testing is reviewed by a

supervisory panel and a technical review by the chief toxicologist occurs, a final report is generated. Kiely identified the report that she prepared and signed regarding Quinones's blood; the report was completed on March 22, 2021. According to Kiely, gas chromatography was used for the screen, which is a method approved by the Ohio Department of Health. The result was positive for the presence of alcohol, and the confirmation test resulted in a value of 0.106, which was above the legal limit of .08.

{¶ 7} On cross-examination, Kiely testified that there is a refrigerator in the property room at the lab, which is behind a door that requires a key card and a pin number to enter. Kiely reviewed the internal chain of custody records for the lab, and she testified that Rebecca Cook, one of the office evidence custodians, had received the kit at the lab from law enforcement on February 22, 2021; Cook placed it in the property room refrigerator. Kiely was not involved in the transfer of Quiniones's kit from the property room refrigerator to the toxicology section, where she opened it.

{¶ 8} Dayton Police Patrol Officer Johnathan Miniard, who had 23 years of law enforcement experience, testified that his training had included the National Highway Traffic Safety Administration ("NHTSA") standards for field sobriety testing. He stated that he was familiar with the most recent NHTSA manual and performed field sobriety tests pursuant to those standards. Miniard had also completed ARIDE training (Advanced Roadside Impaired Driving Enforcement). He was a certified OVI instructor at the police academy.

{¶ 9} On February 20, 2021, at 10:40 p.m., Miniard first observed a white Aurora traveling eastbound on First Street. While traveling in the right lane, the Aurora was

"riding on the line to the left" on the marked lanes. Then, when coming to a stop at a light in the area of North Patterson, the Aurora passed the stop bar and crossed into the crosswalk before stopping, instead of stopping behind the stop bar as required. The driver (Quinones) then "continued on driving on marked lanes," and Miniard initiated a traffic stop. According to Miniard, the stop bar and marked lanes were clearly visible at the time, and there were no obstructions.

{¶ 10} Officer Miniard made contact with Quinones on the passenger side of the vehicle. Quinones was the sole occupant. Miniard advised him of the reason for the stop, and Quinones produced a New York driver's license; the vehicle had Ohio plates. Miniard "noticed some slurred speech and * * * smelled the odor of alcohol coming from the vehicle itself." Miniard removed Quinones from the vehicle and ascertained that the odor of alcohol was coming from Quinones's breath. It was a "moderate odor of alcohol," with a "sweet smell to it," like bourbon. While Miniard explained the reason for the stop, Quinones was argumentative. Quinines claimed he had just come from his son's house and advised Miniard that he was diabetic. Miniard testified that he took that into consideration because some diabetics have "a sweet smell to their breath."

{¶ 11} Miniard further testified that Quinones had bloodshot, glassy eyes that appeared to be jaundiced. Based upon his previous experience as a combat medic in the military, Miniard testified that jaundice causes yellowing of the whites of the eyes and can be caused by alcoholism, marijuana usage, or liver problems. Quinones told Miniard that he had taken his diabetic medication that day. According to Miniard, Quinones could not understand the purpose for the traffic stop and forgot that he had given Miniard his

driver's license.    Miniard stated that Quinones would not listen when told where to stand, continued to be argumentative, and exhibited "up and down mood swings."    In Miniard's experience, people have different "mood swings" with alcohol; some people are very relaxed, some are argumentative, and some have "excessive mood swings." Medical issues also create "complications," which Miniard took into account.    He concluded that alcohol use explained his observations more than any other medical condition, because Quinines stated that he had taken his diabetes medication earlier in the evening.

{¶ 12} Miniard further testified that Quinones's walk and gaze were unsteady. Quinones advised Miniard that he had "some issues" with his feet due to being diabetic, and he "was giving the excuse that his feet were falling asleep and other issues." Another crew was called to the scene after Quinones continued to ignore commands. Quinones was checked for weapons and then voluntarily submitted to a series of standardized field sobriety tests and "ARIDE tests" administered by Miniard.

{¶ 13} On the horizontal gaze nystagmus ("HGN") test, which is recognized by the NHTSA, Miniard provided instructions to Quinones about what would happen and how to stand, then performed the test.    Miniard used a pen with a silver tip as a stimulus so it would be easily seen 12 to 15 inches from Quinones's face.    He instructed Quinones to stand, feet together, hands at his sides, without moving any part of his body or head, and to follow the stimulus back and forth with only his eyes.    Quinones exhibited dilated pupils of equal size, lack of smooth pursuit in both eyes, and nystagmus at maximum deviation in his right eye.    According to Miniard, Quinones was not able to track back and forth according to the instructions, to the point that the officer put his hands at the bottom of

Quinones's chin so he wouldn't move his head while tracking the stimulus with his eyes. Miniard had to repeat the instructions "multiple, multiple times" and restart the test "to make sure [he] got a clear and accurate view" of what he saw. Quinones exhibited four clues of intoxication out of six possible clues on the test. Miniard stated that, with four clues, there was an 80 percent likelihood that the subject was "over the legal limit."

{¶ 14} Miniard next administered the lack of convergence test, in which a stimulus is moved in a circular motion in front of the subject before coming within two inches of the bridge of the subject's nose, while the subject stands feet together, hands at sides. The test was performed twice, and Quinones's eyes never converged when the stimulus was moved toward his nose but rather "looked straight forward," which was consistent with impairment.

{¶ 15} Miniard also administered the modified Romberg balance test, in which the subject stands, feet together, and tilts the head backwards with eyes closed, estimates the passage of 30 seconds from hearing the word "start," tilts the head forward, and says "stop." Quinones took a minute and 19 seconds to indicate the passage of 30 seconds, as timed by Miniard, during which time he talked to himself and asked questions. Miniard testified that he noticed a slight eyelid tremor at the time.

{¶ 16} Miniard next administered the standardized walk and turn test, in which the subject stands in the "instructional position," heel to toe, hands at his sides, before following a series of instructions. Miniard initially demonstrated the proper performance of the test for Quinones. After having the instructions repeated multiple times, Quinones was unable to maintain his balance, started the test early, raised his arms for balance,

veered from the line of travel, turned in the wrong direction, and stopped the test due to pain in his legs. Miniard observed seven clues out of eight for intoxication.

{¶ 17} Finally, Miniard administered the standardized leg stand test, which requires the subject to raise a straight leg six inches off the ground for 30 seconds. Quinones advised Miniard he did not believe that he could perform the test due to his diabetes, but then he opted to attempt the test. Quinones raised his hands from his sides, hopped, swayed, and put his foot down, exhibiting four out of four clues of intoxication, according to Miniard.

{¶ 18} At the conclusion of the field sobriety tests, Miniard placed Quinones in the back of his cruiser and read him a "BMV 2255" form advising him that he was under arrest. Quinones signed the form. Quinones did not have any questions about the form and he agreed to submit to a breathalyzer test at the Safety Building. After he was driven there, Officer Whitmer entered Quinones's information into a Breathalyzer-Intoxylizer 8000 device and attempted to administer the test, but Quinones did not provide a valid sample. Miniard identified the printout from the breathalyzer Whitmer administered at 11:41 p.m. Quinones advised that his asthma made it difficult to complete the test.

{¶ 19} Quinones then agreed to a blood draw within two hours of the observed violations. Miniard transported Quinones to the emergency room at Miami Valley Hospital, where Johnson drew Quinones's blood. Miniard observed that the blood kit had not expired, and he observed the blood draw. Johnson opened the kit in front of him. Miniard recorded that the draw was completed at 12:07 a.m., and he completed the labels. Johnson sealed the kit and returned it to Miniard, and he initialed it.

**{¶ 20}** According to Miniard, he took possession of the kit and was then required to get it to the second floor of the Safety Building, to the Bureau of Identification ("BOI"), in a timely manner, where it would be logged in. Miniard testified that the BOI is a restricted area, and one had to call "records" on the phone and be escorted into the office to place the kit in a refrigerator; the time that the kit is refrigerated and the temperature of the refrigerator are recorded. However, Miniard was delayed in the delivery of the kit because there was a "big incident" in which someone jumped into the river, and he responded to that rescue; the blood kit remained in his cruiser while he responded to the incident at the river, and it was refrigerated "at least an hour and a half" after it was collected. Miniard did not complete the log-in process at the BOI; his partner logged the kit in and put it in the refrigerator. Miniard stated that a detective from the BOI then signs the blood kit out of the BOI and subsequently signs it in at the lab.

**{¶ 21}** Miniard testified that Quinones had denied consuming alcohol while at the scene of the stop; rather, Quinones stated that he was coming from his son's house, but it sounded like he had gotten turned around on Monument Street and was trying to get back to First Street at the time of the stop. According to Miniard, the surface where the field sobriety tests were performed was free of debris, dry, and level. Quinones reported at the time of the tests that he had a slight blurriness in his left eye, which Miniard took into consideration. Quinones was not looking into any lights while performing the tests.

**{¶ 22}** Miniard testified that Quinones never indicated that he was experiencing a diabetic episode or gave any indication of one; Miniard determined, based on his training and experience, that Quinones was not having a diabetic episode, as Quinones

acknowledged that he had eaten and taken his medication. According to Miniard, Quinones displayed more indicators of being impaired (as confirmed by the blood test) than that he was having a diabetic episode.

{¶ 23} At the conclusion of the hearing, the court indicated to the parties and counsel that it was "very comfortable with the chain of custody and the testing and things of that nature" but had "questions. . . on the front end" about probable cause, the reason for the stop, and some issues concerning the field sobriety tests. The court requested additional briefing on these issues.

**Post-Hearing Briefing**

{¶ 24} In its post-hearing brief, the State argued that Miniard had "more than sufficient probable cause to justify Quinones's arrest for OVI," Miniard had administered the field sobriety tests in substantial compliance with NHTSA standards, and the results were admissible "for probable cause and use as evidence at trial." The State further asserted that probable cause for arrest existed even without consideration of the field sobriety tests. Quinones stated that his health conditions and the conditions of the roadway required suppression of the results of the field sobriety tests.

**Decision on Motion to Suppress**

{¶ 25} In ruling on the motion to suppress, the court noted that the State and defense counsel had stipulated to the cruiser camera video of the stop, which the court had reviewed. The court also took judicial notice of the 2018 NHTSA Detection and

Standardized Field Sobriety Testing Manual related to intoxication.

{¶ 26} The court found that the results of the field sobriety tests and Quinones's inability to follow instructions had provided sufficient probable cause to arrest him for OVI and to request that he submit to further chemical testing. After reviewing the testimony, exhibits, and the cruiser video, the court also found that Miniard had reasonable articulable suspicion to initiate the traffic stop and conduct the field sobriety tests.

{¶ 27} The court noted that the blood test issues raised by Quinones were addressed at the suppression hearing. It found that the tests had been administered in substantial compliance with the NHTSA manual.

**Assignments of Error and Analysis**

{¶ 28} We will consider Quinones's first and second assignments of error together. They are:

THE TRIAL COURT ERRED IN A DETERMINATION OF REASONABLE SUSPICION BASED ON A MARKED LANES VIOLATION.

THE TRIAL COURT ERRED IN FINDING REASONABLE SUSPICION FOR DRIVING UNDER THE INFLUENCE OF ALCOHOL AND/OR DRUG OF ABUSE SUFFICIENT TO ADMINISTER FIELD SOBRIETY TESTS.

{¶ 29} In his first assignment of error, Quiones argues that driving "onto the line is not a traffic violation; only crossing the line is a violation." He asserts that the State was required to show both that he had failed to ascertain that it was safe to leave his lane of travel and that he went into another lane of travel. In his second assignment of error,

Quinones argues that most of Miniard's observations related to Quinones's health conditions and not the use of alcohol, and he asserts that even Miniard admitted that "such observations can be related to diabetes, kidney issues, etc." He argues that nothing specifically pointed to intoxication.

Standard of Review

{¶ 30} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 16. "Accepting those facts as true, the appellate court must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied." *State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.).

Waiver

{¶ 31} Pursuant to Crim.R. 47, a motion to the court, including a motion to suppress, must "state with particularity the grounds upon which it is made and shall set

forth the relief or order sought."  *State v. Demus*, 192 Ohio App.3d 181, 2011-Ohio-124, 948 N.E.2d 508, ¶ 13-14 (2d Dist.).  If a motion to suppress fails to state a particular basis for relief, that issue is waived and cannot be argued on appeal.  *Id.,* citing, *e.g., State v. Cullins,* 2d Dist. Montgomery No. 21881, 2007-Ohio-5978, ¶ 10; *State v. Carter*, 2d Dist. Montgomery No. 21999, 2008-Ohio-2588, ¶ 20.  "The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits.  Therefore, the defendant must make clear the grounds upon which he challenges the submission of evidence pursuant to a warrantless search or seizure.  Failure on the part of the defendant to adequately raise the basis of his challenge constitutes a waiver of that issue on appeal." (Citations omitted.) *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988); *State v. Matthews*, 2d Dist. Miami No. 2014-CA-23, 2015-Ohio-1750, ¶ 25.

{¶ 32} We agree with the State that the issues in these assignments of error were waived.  As noted above, Quinones's motion to suppress was limited to the allegedly improper administration of the field sobriety tests, the existence of probable cause for his arrest, and suppression of the blood test results.   In other words, Quiniones did not challenge the validity of the stop or his detention for field sobriety testing in his motion.  We further conclude, for the reasons that follow, that reasonable articulable suspicion was demonstrated.

*Terry* Stop

{¶ 33} "The Fourth Amendment to the United States Constitution and Section 14,

Article I of the Ohio Constitution guarantee 'the right of people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures*.' " (Emphasis sic.) *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (2d Dist.1995). "Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer who lacks probable cause to arrest may, consistent with the Fourth Amendment, make an investigatory stop, including a traffic stop, of a person if the officer has reasonable suspicion to believe that the person is or is about to be engaged in criminal activity." *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527, ¶ 19, citing *Navarette v. California*, 572 U.S. 393, 396, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014). However, "[a]n officer cannot continue to detain a suspect past the time necessary for investigating and completing the initial traffic stop merely to conduct a 'fishing expedition' for other criminal activity." *State v. Brown*, 2d Dist. Greene No. 2011-CA-52, 2012-Ohio-3099, ¶ 13, quoting *State v. Jones*, 2d Dist. Montgomery No. 23920, 2010-Ohio-5522, ¶ 16. "If an officer makes a stop for a traffic offense, the officer must have a reasonable, articulable suspicion that a person is driving under the influence to justify further detention for the administration of field sobriety tests." *Id.,* citing *State v. Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, ¶ 11 (2d Dist.).

**{¶ 34}** "Whether an officer had a reasonable, articulable suspicion to administer field sobriety tests is a 'very fact-intensive' determination." *Santiago* at ¶ 13, quoting *State v. Wells*, 2d Dist. Montgomery No. 20798, 2005-Ohio-5008, ¶ 9. In determining whether there was a reasonable, articulable suspicion, the court must evaluate the totality of the circumstances. *State v. Gladman*, 2d Dist. Clark No. 2013-CA-99, 2014-Ohio-2554,

¶ 14. These circumstances must be considered " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *Id.*, quoting *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14. "Many observations can satisfy this reasonable, articulable suspicion, including the odor of an alcoholic beverage emanating from the vehicle, glassy bloodshot eyes, * * * and slow or slurred speech." (Citation omitted.) *Brown* at ¶ 13.

{¶ 35} In regard to Quinones's argument that the testimony did not establish a marked lanes violation, we note that he was also cited for failure to stop, in violation of R.C. 4511.43(A): "every driver of a vehicle * * * approaching a stop sign shall stop at a clearly marked stop line * * * before entering the crosswalk on the near side of the intersection * * * ." The cruiser camera video and Miniard's testimony established that Quinones failed to stop until he was inside the crosswalk and past the stop line at a red light. In other words, reasonable articulable suspicion for the stop was demonstrated for failure to stop aside from the alleged marked lane violation.

{¶ 36} Further, reasonable articulable suspicion for Quinones's detention for field sobriety testing was demonstrated. Miniard, who had substantial experience as a patrol officer and was trained on NHTSA standards, testified that he detected the smell of alcohol on Quinones's breath, that Quinones's speech was slurred, that his eyes were glassy, bloodshot, and appeared jaundiced, and that Quinones was also unsteady on his feet. The cruiser video corroborated some of Miniard's testimony regarding Quinones's demeanor during the stop. After removing Quinones from the vehicle, Miniard explained the purpose for the stop multiple times, while Quinones denied the violations in an

argumentative manner. Quinones exhibited mood swings by acquiescing to some commands and defying others, and his speech was often unintelligible. Miniard repeatedly told Quinones to stand out of the roadway, and Quinones approached Miniard's cruiser after being told to remain at the side of the road. Quinones demanded to see a video of the violations. After giving Miniard his driver's license upon request before getting out of his vehicle, Quinones asked how Miniard had obtained his license. At certain points in the video, Miniard can be heard telling Quinones that he was unable to understand what Quinones was saying. Miniard also told Quinones to calm down. Miniard testified that, based upon his significant training and experience, his observations of Quinones were indicative of someone who might be impaired by alcohol; he determined that further investigation was warranted and administered the field sobriety tests. Even if Quinones's first two assignments of error were not waived, we would determine that reasonable articulable suspicion for the stop and further detention for field sobriety testing were demonstrated. The first and second assignments of errors are overruled.

{¶ 37} Quinones's third assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT THE FIELD SOBRIETY TESTS WERE CONDUCTED IN SUBSTANTIAL COMPLIANCE WITH THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION MANUAL.

{¶ 38} Quinones argues that snow and ice, the condition of the road, and

Quinones's medical conditions support his argument that Miniard did not comply with NHTSA standards. The State responds that no evidence was presented to substantiate any "actual medical or physical conditions" and that Quinones's claims have nothing to do with Miniard's compliance with the NHTSA Manual in administering the field sobriety tests. We agree with the State.

{¶ 39} "The applicable legal requirement for admission of field sobriety tests is whether they were conducted in substantial compliance with NHTSA standards." *State v. Tyner*, 2d Dist. Montgomery No. 25405, 2014-Ohio-2809, ¶ 7, citing R.C. 4511.19(D)(4)(b) and *State v. Davis*, 2d Dist. Clark No. 2008-CA-65, 2009-Ohio-3759, ¶ 14-15. Substantial compliance " 'is a legal standard for a court's determination.' " *Id.*, quoting *Davis* at ¶ 18. " 'We defer to the trial court's factual findings and independently determine whether they demonstrate substantial compliance' with the standards." *Id.*

{¶ 40} "The results of field sobriety tests generally are admissible so long as the proper foundation has been laid as to both the administering officer's training and ability to administer the tests and the actual technique he or she used to administer the tests." *State v. Boles*, 2020-Ohio-4485, 158 N.E.3d 1013, ¶ 15 (2d Dist.), citing *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 28. "Accordingly, the State's burden of proof regarding the admissibility of field sobriety test results 'is not an onerous one'; ' "general testimony that all pertinent rules and regulations had been followed in conducting the defendant's test, if unchallenged, would amount to a sufficient foundation for the admission of the results." ' " *Id.*, quoting *State v. Murray*, 2d Dist. Greene No. 2002-CA-10, 2002-Ohio-4809, ¶ 11. (Other citation omitted.)

**{¶ 41}** Miniard had 23 years of experience and was trained on NHTSA standards, was familiar with the most recent NHTSA manual, and had also completed ARIDE training. He was certified to instruct on those standards. Miniard administered the field sobriety tests in accordance with his training and those standards, according to his testimony, and he thoroughly described the techniques and instructions he used to administer the tests and his focus on obtaining accurate results. In other words, the tests were administered and evaluated in a standardized manner for indicators of impairment.

**{¶ 42}** The cruiser video reflected that the field sobriety tests were administered near the Dragons' stadium on First Street. Although snow was visible on the sidewalk, the video reflected that the tests were administered on the roadway, the surface of which had no snow and was flat and dry, without any obstructions, and with adequate lighting in the area. Quinones's arguments regarding the conditions of the testing area were properly rejected.

**{¶ 43}** The video further reflected the detailed administration of the field sobriety tests, which was consistent with Miniard's testimony regarding Quinone's inability to complete the testing. Miniard considered the possible connection between the sweet smell of alcohol on Quinone's breath and diabetes, as well as the fact that the appearance of jaundice in the eyes can be caused by marijuana usage and liver problems. The fact that Quinones did not state that he was experiencing a diabetic episode, stated that he had taken his diabetes medication as prescribed, and stated that he had eaten prior to the stop were significant to Miniard in concluding that Quinones was impaired and not experiencing a diabetic episode. Based on this evidence, the trial court did not err in

finding that the field sobriety tests had been properly administered. Quinones's third assignment of error is overruled.

{¶ 44} Quinones fourth assignment of error states:

THE TRIAL COURT ERRED IN FINDING PROBABLE CAUSE FOR

AN ARREST OF APPELLANT FOR DRIVING UNDER THE INFLUENCE

OF ALCOHOL AND/OR A DRUG OF ABUSE.

{¶ 45} Quinones argues that Miniard did not testify as to all of the elements of the moving violation and that the moderate odor of alcohol and the field sobriety test results could have easily been explained by Quinones's physical maladies, the cold temperature, and being lost and confused late at night. He asserts that the "ambiguity of the evidence" precluded a finding of probable cause. The State responds that, with or without the results of the field sobriety tests, Miniard "articulated sufficient probable cause" to justify Quinones's arrest for OVI.

{¶ 46} "Probable cause is a stricter standard than reasonable and articulable suspicion." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23, citing *State v. Evans*, 67 Ohio St.3d 405, 411, 618 N.E.2d 162 (1993). "A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 66, citing *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime." *State v. Adams*, 2d Dist. Montgomery No. 24184, 2011-Ohio-4008, ¶ 7, citing *State v. Timson*, 38 Ohio St.2d 122,

311 N.E.2d 16 (1974). "Ohio decisions have interpreted this definition to include the 'totality' of facts and circumstances surrounding the arrest." (Citations omitted.) *State v. Brandenburg*, 41 Ohio App.3d 109, 111, 534 N.E.2d 906 (2d Dist.1987). "Probable cause may exist even in the absence of any evidence of impaired motor coordination." *Id.*, citing *State v. Finch*, 24 Ohio App.3d 38, 492 N.E.2d 1254 (12th Dist.1985).

{¶ 47} We agree with the State that, even in the absence of the field sobriety test results, probable cause for Quinones's arrest was demonstrated by the cruiser video. After being stopped for the demonstrated traffic violations, Quinones's appearance and demeanor, as detailed above, would have caused a reasonably prudent person to believe, under the totality of the circumstances, that Quinones had committed an OVI offense. Thus, probable cause for Quinones's arrest was demonstrated. His fourth assignment of error is overruled.

{¶ 48} Quinones fifth assignment of error states:

THE TRIAL COURT ERRED IN ADMITTING THE BLOOD DRAW, AS IT WAS COLLECTED AND NOT REFRIGERATED AS REQUIRED BY LAW.

{¶ 49} According to Quinones, Miniard's testimony was "vague" as to how long the blood sample remained unrefrigerated, and there was no testimony from his partner, the officer who logged the sample into the logbook, as to exactly how long the sample had been unrefrigerated. He asserts that, without testimony as to the timeline or testimony from the officer who did actually log it in and refrigerate it, there was no showing that the State actually complied with the regulations, and the State failed to meet its burden of

showing substantial compliance with NHTSA regulations.

{¶ 50} Pursuant to R.C. 4511.19, "only a physician, a registered nurse, an emergency medical technician-intermediate, an emergency medical technician-paramedic, or a qualified technician, chemist, or phlebotomist shall withdraw a blood sample[.]" R.C. 4511.19(D)(1)(b). The administrative requirements also provide that "the bodily substance withdrawn * * * shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code." *Id.* Pursuant to R.C. 3701.143, "the Ohio Director of Health has promulgated regulations governing the collection, handling, and analysis of bodily substances, which are set forth in Ohio Adm.Code Chapter 3701-53." *State v. Moore,* 2d Dist. Montgomery No. 28640, 2021-Ohio-1114, ¶ 27, citing *State v. Owens*, 6th Dist. Lucas No. L-15-1215, 2016-Ohio-3092, ¶ 16; *State v. Waldock*, 2015-Ohio-1079, 33 N.E.3d 505, ¶ 51 (3d Dist.). Ohio Adm.Code 3701-53-06(G) (formerly Ohio Adm.Code 3701-53-05(F)), requires that all blood specimens "will be refrigerated" while not in transit or under examination.

{¶ 51} Courts apply "a burden-shifting procedure to govern the admissibility of alcohol-test results." *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 24. That procedure is as follows:

The defendant must first challenge the validity of the alcohol test by way of a pretrial motion to suppress * * *. After a defendant challenges the validity of test results in a pretrial motion, the state has the burden to show that the test was administered in substantial compliance with the regulations

prescribed by the Director of Health. Once the state has satisfied this burden and created a presumption of admissibility, the burden then shifts to the defendant to rebut that presumption by demonstrating that he was prejudiced by anything less than strict compliance. * * * Hence, evidence of prejudice is relevant only after the state demonstrates substantial compliance with the applicable regulation.

(Citations omitted.) *Id.*

{¶ 52} The Supreme Court of Ohio has held that "failing to refrigerate a blood specimen for a period of four hours and ten minutes before placing it in transit for analysis is a de minimis error and does not render the test result inadmissible for failure to substantially comply" with administrative regulations. *State v. Baker*, 146 Ohio St.3d 456, 2016-Ohio-451, 58 N.E.3d 1114, ¶ 21. In *State v. Wood*, 2023-Ohio-2788, 222 N.E.3d 1247 (2d Dist.), we determined that the defendant's expert witness had failed to demonstrate that he was prejudiced by a one-hour and 50 minute delay in refrigerating his blood sample based upon the sample's allegedly undergoing fermentation, because the expert opined that it could not be determined how much alcohol Wood had consumed and how much was produced by fermentation; as such, the testimony about fermentation went to the weight of the blood alcohol test results, not their admissibility. *Id.* at ¶ 53.

{¶ 53} We cannot conclude that Quinones's blood test result was inadmissible for failure to substantially comply with the Ohio Administrative Code. Johnson completed the blood draw and kit at 12:07 a.m. Miniard testified about the procedures for logging a blood kit into the BOI, where it is refrigerated until it is transferred to the lab and again

refrigerated until testing occurs. While Miniard did not log the kit into the BOI, he testified that the kit was refrigerated at least an hour and a half after 12:07 a.m. Kiely testified that samples are refrigerated when not being transported or tested as a matter of policy. While Quinones's kit remained locked in Miniard's cruiser while he responded to the emergency at the river, it was in the cruiser for purposes of transporting it for analysis prior to refrigeration. We conclude that the State created a presumption of admissibility, and Quinones failed to demonstrate that he was prejudiced by less than strict compliance in refrigerating the blood kit. Quinones fifth assignment of error is accordingly overruled.

{¶ 54} Finally, Quinones's sixth assignment of error states:

THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY AFTER A NO CONTEST PLEA AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 55} Quinones repeats his arguments in his first five assignments of error. The State responds that this is not "an exceptional case weighing heavily against conviction. Neither of these arguments addresses that Quinones entered a no contest plea.

{¶ 56} A conviction following a no-contest plea does not derive from evidence adduced at a trial, but from the no-contest plea itself, which is "an admission of truth of the facts alleged in the indictment." Crim.R. 11(B)(2). Therefore, a conviction based upon a no-contest plea is not amenable to review on appeal for whether it was against the manifest weight of the evidence. *State v. Hall*, 2d Dist. Montgomery No. 23488, 2009-Ohio-6390, ¶ 27, citing *State v. McGhee,* 2d Dist. Montgomery No. 14515, 1995 WL 19111 (Jan. 18, 1995). Accordingly, Quinones's sixth assignment of error is overruled.

**{¶ 57}** Having overruled all of Quinones's assignments of error, the judgment of the municipal court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.